UNITED STATES of America

v.

Morris C. GOLDBERG, also known as Moe Goldberg and M. C. Goldberg, Appellant.

No. 14148.

United States Court of Appeals Third Circuit.

Argued June 5, 1963.

Decided March 17, 1964.

Certiorari Denied June 1, 1964. See 84 S.Ct. 1630.

Thomas D. McBride, Philadelphia, Pa. (Raymond J. Bradley, Philadelphia, Pa., on the brief), for appellant.

J. Shane Creamer, Asst. U. S. Atty., Philadelphia, Pa. (Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and McLAUGHLIN and GANEY, Circuit Judges.

GANEY, Circuit Judge.

The appellant here, Morris C. Goldberg, was convicted after a trial by a jury in the District Court for the Eastern District of Pennsylvania, under an indictment wherein he was jointly charged with Rudolph Csicsek (hereinafter known as "Rudy") with several offenses concerning income taxes, due from him personally, as well as from some corporations, thirteen in number, which he allegedly controlled. The indictment contained fifty-one counts and covered the years 1955 and 1956, pursuant to 26 U.S.C. § 7201 (1954).

Rudy subsequently plead nolo contendere, later numerous counts were withdrawn, and the only ones submitted to the jury were one, two, three, four, five, seven, eight and nine. A verdict of guilty on all counts was rendered by the jury and later the court granted the appellant's motion in arrest of judgment as to count one. Accordingly, on this appeal we are concerned only with counts two, three, four, five, seven, eight and nine.

The respective counts are as follows: Count two charged the appellant, Goldberg, with wilfully and knowingly attempting to evade a large part of his individual taxes owing to the Government by filing and causing to be filed a false and fraudulent individual income tax return for the year 1955. Count three charged the appellant with the same offense for the year 1956. Count four charged the appellant, as President of the Pennsylvania Coat and Apron Supply Co. of New Jersey, with wilfully and knowingly attempting to evade a large part of the taxes owing by that corporation for the period January 1, to September 1, 1955, by filing and causing to be filed a fraudulent tax return for that corporation. Count five charged the appellant, as President of the Pennsylvania Laundry Co., with the same offense for the calendar year 1955. Count seven charged the appellant, as President of the Pennsylvania Coat and Apron Supply Co., a Pennsylvania corporation, with the same offense for the calendar year 1956. Count eight charged the appellant, as President of Anderson's Empire Coat, Apron and Towel Supply, Inc., with knowingly and wilfully evading a large part of the taxes due and owing to the Government by that corporation, by causing to be prepared and causing to be filed in the District of Camden, Camden, New Jersey, a false and fraudulent return for that corporation for the calendar year 1955. Count nine charged the appellant, as President of Anderson's Empire Coat, Apron and Towel Supply, Inc., with the same offense for the calendar year 1956.

The record discloses that the appellant, as President of some thirteen corporations which were engaged largely in the linen supply business, directly or indirectly owned all of the stock in these corporations. In addition to the corporations here above mentioned, there must be included also the Keystone Coat and Apron Manufacturing Corp., the Keystone Mercantile Corp. and Gold Tex Fabrics Corp.

On December 31, 1954, the Loans and Exchange Accounts in appellant's corporations showed that he was personally indebted to them in the sum of $387,390.-14, largely carried on the books of the Keystone Coat and Apron Manufacturing Corp. and the Keystone Mercantile Corp., and as of June 22, 1955, this amount had been reduced to the sum of $280,000.00. These Loans and Exchange Accounts were made up of checks issued by the corporations to the appellant for his personal use and deposited in banks to his personal account and, additionally, amongst other things, in connection with oil gas leases, race track betting, as well as checks made payable to other individuals or corporations at appellant's direction and included the years 1955 and 1956.

In order to meet expansion programs and to have a more efficient operation of his business, the appellant sought a long-term loan of $2,000,000 from the Jefferson Life Insurance Company early in 1955. The insurance company advised him, after making a survey of his various corporations, including visits to his plants, that they would grant the loan if his personal indebtedness to the corporations was reduced by $120,000, as of September 1, 1955, and if the Pennsylvania Coat and Apron Supply Co. became merged with the Pennsylvania Laundry Co., as of that date. This seemed like an impossible requirement and the appellant attempted to borrow $280,000 in June of 1955 from a certain bank in Philadelphia, but being unable so to do, he undertook to meet the insurance company's requirement by proposing to it in a letter dated June 18th, that he reduce his indebtedness, as evidenced by his Loans and Exchange Accounts in 1955, by paying off $70,000 in July, $90,000 in August, and $10,000 a month as a minimum thereafter. As of September 1, 1955, the merger of the Pennsylvania Coat and Apron Supply Co. with the Pennsylvania Laundry Co. was completed and the appellant's personal loans to his various corporations were reduced so that the loan from the Jefferson Life Insurance Company of $2,000,000 was granted, although his income was $50,000 from Key-

stone Coat and Apron Supply Co. and $9,766 additional income, making an adjusted income of $59,766 for the year 1955, and he made no resort to outside borrowing.

Through a series of financial operations tedious in nature, the lengthy record discloses a complex accounting practice, yet simple in the results sought to be achieved—the filing of fraudulent tax returns—which we shall briefly review. Rudy was employed by the appellant for the period from October, 1946, to June of 1956, and then from September or October of 1956, to June of 1958. He started as a bookkeeper with the appellant, later became an accountant, then became controller of all his corporations and finally administrative assistant to him, in which capacity he had supervision and control of all the books and records of the corporations covering the years set forth in the indictment, to wit, 1955 and 1956.

The record discloses that in January of 1955, Rudy was called into the appellant's private office and there appellant told him he should take the cash and sales journals of the Pennsylvania Coat and Apron Supply Co., beginning with January, 1955, and re-write them by reducing the cash sales, as shown from the cashier reports, which reflected the cash collected by drivers of the appellant, in an amount that woud be around $3500 per week, not in the same amount, each and every week, but on an over-all period which would average out to $3500 per week. After rewriting the original sheets, the amounts so reduced were to be credited to appellant's Loan and Exchange Accounts in his corporations showing, in effect, a repayment in the same amount by the appellant. Pursuant to these instructions, Rudy worked up the payment sheets which were rewritten on a weekly basis, whereas they had been written on a daily basis, and showed them to the appellant who told him that was the way he wanted the matter done. However, since it required a great deal of time to so do, the appellant suggested that it be turned over to someone else, and Rudy mentioned Dan Ferrari, who handled the books of the Pennsylvania Coat and Apron Supply Co., and appellant approved thereof and advised Rudy to instruct Ferrari as to how the cash and sales journals were to be written and the same amounts credited to his Loan and Exchange Accounts. The appellant gave specific instructions that after the cash and sales journals had been rewritten, the original records should be destroyed by both Rudy and Farrari, who did all the rewriting of the sheets, which, as stated, showed reduced cash income and a corresponding credit to appellant's Loan and Exchange Accounts in the various corporations. However, they did not destroy them, but placed the originals in files in their offices under their custody and control, never advising the appellant of their so doing, the larger part of which Rudy gave to the Government.

An instance typical of the operation which was carried on by Rudy is that of the Pennsylvania Coat and Apron Supply Co. of New Jersey. Here, the original cash receipts and sales journals for this corporation showed a total income through sales for the month of January, 1955, of $147,599.50. When rewritten by him, pursuant to the appellant's instruction, the cash receipts and sales totaled sales of $133,599.50, or a reduction in cash sales of $14,000.00, and then this exact sum was shown as a repayment to the appellant's Loan and Exchange Account. For the same corporation for the month of February, 1955, the original receipts and sales journals showed total cash sales of $143,504.82, which cash sales were rewritten by Rudy, at the appellant's instruction, to show a total cash sales of $128,504.82, or a reduction in cash sales of $15,000.00, which was carried over to the appellant's Loan and Exchange Account as an alleged repayment by the appellant.

Ferrari carried on the operation, as directed by Rudy, by rewriting sales journals and crediting the amount to the Loan and Exchange Accounts and during an interim period when Rudy had left appellant's employ, out of an abundance

of caution, he questioned appellant in June of 1956, and appellant told him to carry on as Rudy had previously told him, which he did, until he left appellant's employ in April of 1958. Typical of the operation carried on by Ferrari was Anderson's Empire of Atlantic City for July, 1955. Here the original record showed total sales in the cash receipts and sales journal of that corporation for that month of $119,173.68 and the rewritten record by Ferrari showed total sales for that corporation of $79,173.68, or a difference of $40,000.00. On the front of the rewritten sheet was a notation in quotation marks, "A July 1955 M", which indicated to Ferrari that $40,-000.00 was to be the amount of the sales reduction, as directed by Rudy, as the notation was in his, Rudy's, handwriting. Here, again, the $40,000.00 was credited to appellant's Loan and Exchange Account.

It would serve no useful purpose to recite the exceedingly numerous rewritten sheets during 1955 and 1956, showing reductions in cash sales and an identical credit to appellant's Loan and Exchange Account covering the years laid in the indictment. Suffice it to say the Government's contention is that the appellant by causing the repayments to his Loan and Exchange Accounts in the amounts of the falsely reduced sales were income to him in those years, if when he withdrew the funds, his intention was to repay them, and the trial court specifically so charged. The jury found an intent to repay these personal funds and thus was created income to him in those years.

The admission into evidence of the rewritten sales sheets, on which the Government predicated the allegations in the indictment, that the appellant had defrauded the Government in the filing of his personal returns as well as those of the corporations—since both the personal and corporate returns were based on these sheets—while vigorously fought on other grounds, during the trial of the case, neither in argument nor in their briefs, did counsel deny that the comparison of the original sales records with

them and on which the returns were made in Pennsylvania Coat and Apron Supply Co. of New Jersey for 1955, Pennsylvania Laundry Co. for 1955, Pennsylvania Coat and Apron Supply Co. for 1956, as well as Anderson's Empire for 1955 and 1956, had been substantially understated.

Ferrari was in the employ of the appellant, as an accountant from April, 1953, until April of 1958, and rewrote most of the records hereinabove adverted to, from March of 1955, until the end of December, 1956, the years in question. When he left in 1958, he took with him, without the permission of the appellant, records pertaining to the sales of Pennsylvania Coat and Apron Supply Co. of New Jersey, and Anderson's Empire and turned them over to the Government on August 5th, 1958. He was the first person to contact the Government agents, which he did by telephoning the Internal Revenue Service on August 2nd, 1958, making an appointment with the Government agents for August 4th, 1958.

Raymond Dombkiewicz was an accountant and office manager for the appellant from October, 1954, until August, 1958, and during the year 1955, he was an accountant for Keystone Coat and Apron Manufacturing Corp. and for Gold Tex Fabrics Corp. In August, 1958, he left the appellant's employ, at which time he took with him records pertaining to the appellant's Loan and Exchange Accounts with Pennsylvania Coat and Apron Supply Co. of New Jersey, as well as the same corporation of Pennsylvania, and cashier reports concerning the sales of these corporations and those of Pennsylvania Laundry. These records covered the years 1955 and 1956. Dombkiewicz and Ferrari discussed the case with the agents on August 4th, 1958, and on August 5th, they both filed applications for informer's fees and after so doing, they turned over the records they had taken from the appellant to the Government agents. In the instance of Rudy, however, he had been indicted on February 16, 1961, had changed his plea from guilty to nolo contendere on April 14,

1961, and turned the records he had taken over to the Government agents on April 18, 1961. However, previous to their being turned over, he had received definite assurance from the United States Attorney and, by a simile, from the court, that if he cooperated with the Government he would not go to jail. This cooperation envisaged, among other things, the turning over of any documentary evidence he might have, though it is clear that neither the United States Attorney nor the Government agents knew what the documents were, which he had in his possession and which he turned over, until they examined them.

■ It is clear beyond contradiction that in the instances of the three main Government witnesses, Rudy, Dombkiewicz and Ferrari, the Government had no part or knowledge that they were going to take the records they turned over. Rudy's own counsel or the United States Attorney knew nothing thereof, until after Rudy's plea was changed and, with respect to Ferrari and Dombkiewicz, the uncontradicted evidence discloses the taking of the records prior to any communication with any Government officials. The most that can be said for the appellant's case is that in the case of Rudy, he had the assurance that, by cooperating, he would not go to prison and, in the instances of Dombkiewicz and Ferrari, they were to receive an informer's reward. At best this went to the credibility of these witnesses whom the jury saw and heard and, by their verdict, finally believed, and, as the lower court phrased it, the Government was "the unwitting beneficiary" of their wrongful taking. Was their admission error?

■■ We think the documents and records were clearly admissible under Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048. Here, certain of McDowell's business associates had taken from his safe, without his knowledge, certain documents and had turned them over to Government officials. McDowell then filed a petition seeking their return, as they were about to be present-

ed to a Grand Jury. Here, the evidence established that no Government official had participated in or had been connected with the taking and that since the documents came into their possession without a violation of McDowell's rights by any Government authority, the Government could retain them and use them as evidence. In our instance, additionally, the records were not personal records of the appellant, but belonged to the various corporations concerned and since they were, the appellant had no basis on which to object to their admission. United States v. Guterma, 2 Cir., 272 F.2d 344; Lagow v. United States, 2 Cir., 159 F.2d 245.

The appellant contends the force and effect of Burdeau v. McDowell, supra, has been greatly weakened, if not changed, by Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669. Here, state officers had seized certain tape recordings and a recording machine as the result of an unlawful search and seizure which had, in no wise, been participated in by any federal officer and the court held that the evidence so seized could not be used in the trial of the case and set aside the defendant's conviction. This case reversed the trend of previous federal decisions by refusing to admit evidence offered as the result of an illegal search and seizure by state officials even where no participation was had by federal officers. However, here again the court was only concerned with state action and its ruling, in no wise, impaired Burdeau v. McDowell, supra. While the appellant contends that "The imperative of judicial integrity", coined in this case, would be violated in principle, just as much by a private individual, it is paradoxical that the appellant here should invoke that doctrine when the material offered in evidence against him was the true and actual records of his corporation's sales, which were to be destroyed at his specific direction, and in the face of this fraudulent scheme, to give him the cloak of its protection would be most unseemly.

■ The next error the appellant complains of was the admission by the court

of Exhibit D7. D7 was first brought out on the cross-examination of Rudy by the appellant and consisted of a summary made in his handwriting, which the appellant contends was the actual closing inventories of the corporations here involved. The amount of the inventories shown thereon was substantially less than the closing inventories stated in the tax returns filed by the respective corporations and the contention of the appellant is that the difference shown on the inventories on D7 and the inventories reported in the tax returns were equal to the amounts by which the sales were understated. However, it was not brought out and the record does not disclose where Rudy got the figures, whether they were accurate or imaginary, whether he got them from the books of the corporations or from the firm which audited the books. It contained certain erasures, overwriting, marks crossed through, and additional figures written above the same. As has been stated, the summary was brought out during Rudy's cross-examination and yet counsel for appellant made no attempt to question him about it, and the physical condition of Rudy made it impossible for the Government to later recall him in rebuttal and make explanation in connection therewith.

It is submitted that there was no error in the admission of D7, inasmuch as the court charged that if the jury believed that D7 correctly stated the actual closing inventories and, as a result, the expenses of Pennsylvania Coat and Apron Supply Co. of New Jersey for 1955, Pennsylvania Coat and Apron Supply Co. of Pennsylvania for 1956, Pennsylvania Laundry Co. for 1955, and Anderson's Empire for 1955 and 1956, were understated in the returns to an amount equal to any understatement of sales, there would be no taxable income due the Government, in which event they should find the appellant not guilty on counts four, five, seven, eight and nine. It is submitted that his instruction is correct and that appellant was, in no wise, prejudiced. The appellant's contention is that it should have been accepted as accurate forthwith since the Government had the burden of investigating the truth or falsity of the closing inventories, citing Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. However, this case is, in no wise, apposite, since that was a tax evasion case in which the Government relied on certain net worth computations by it and the court held it was requisite, where certain leads were used to prove the defendant's guilt, that the Government had the burden of investigating them and, failing to so do, the Government's case was insufficient to go to the jury. Here, the appellant requested that the court charge that the Government had the burden of investigating the truth or falsity of the closing inventories in D7 and since they did not, the jury could conclude that the Exhibit D7 showed the actual closing inventories without proof of its correctness by the appellant. Here, however as the court below points out, the inventory figures on the tax returns filed were the corporate taxpayer's own figures, not the Government's, and it could not require of the Government the duty of determining which figures were correct, that of appellant's corporate returns or an entirely different set of figures compiled by the corporation's own accountant brought on the record by the appellant. Additionally, the record discloses that the Government agents made every attempt to check into the inventories and the condition of every one of the corporations here involved, by making repeated requests for inventory information, but they were unable to secure the same and they had nothing else to do but assume that the inventory returns were correct.

The next alleged error on the part of the court is its refusal to instruct the jury, as requested in appellant's Point for Charge 4, which reads as follows:

"Even if you are convinced beyond a reasonable doubt that there was a conspiracy between Goldberg and Csicsek which, as alleged in the in-

dictment, began on or before January 1, 1954, then such a finding would be inconsistent with the theory upon which the prosecution rests on the charges contained in Counts 2 and 3 of the indictment, and you must then find Goldberg Not Guilty on Counts 2 and 3."

It is the contention of the appellant under this proposed Point for Charge that the conspiracy count of the indictment charging Rudy and the appellant with conspiring, beginning on or before January, 1954, to evade and defeat appellant's income tax for the years 1955 and 1956, by making false and fictitious entries in the books and records of the corporations controlled by the appellant, was tantamount to averring that there never was any real indebtedness owed by the appellant to his corporations and if there ever was any realizable income, it was from the withdrawals of funds from them. The contention, more particularly set forth on page 33 of the appellant's brief, states, with reference to count one, "Thus, if this charge is correct, there never was any real indebtedness incurred by Goldberg, and if he had any income, it was realized when he withdrew funds from the corporations and not when credits were made to his Loan and Exchange Accounts. The inconsistency which the appellant asserts is that a finding of guilty on count one precludes the finding of guilty on counts two and three, the substantive counts. With this we disagree. All of the overt acts in the first count were withdrawn before the case was submitted to the jury, with the exception of overt acts Nos. 25 and 26, which charged the filings of fraudulent returns for the years 1955 and 1956. However, appellant here takes the position that since the conspiracy as alleged, began on or before 1954, when there was owing by the appellant more than $300,000, as of December 31, 1954, the withdrawals it represented were income to him at the time, which was for a taxable period previous to the years 1955 and 1956, as laid in counts two and three, and, accordingly, there is a con-

tradiction therein. However, the false entries by which the conspiracy was to be accomplished, as alleged in count one, were not the withdrawals in 1954, nor at any later date, but the false entries on the sales sheets in 1955 and 1956, and there crediting to his Loans and Exchange Accounts.

As the case went to the jury, there was then no necessity for the trial court to give Point for Charge No. 4, since it did charge the jury with respect to Point No. 3.

"If you find that at the time defendant withdrew funds from any of the corporations involved in this case, he had no intent to repay the funds withdrawn, then such withdrawals constitute income to him in the year they were withdrawn, and the credits which he may have received subsequently do not constitute taxable income to him and are insufficient to justify a guilty verdict on Counts 1, 2 and 3 of the indictment."

Again, the conspiracy in count one recites the receipt of income during 1955 and 1956, from Pennsylvania Coat and Apron Supply Co., a New Jersey corporation, Anderson's Empire Coat, Apron and Towel Supply Co., a New Jersey corporation, and Pennsylvania Laundry Co., a Pennsylvania corporation, which he failed to report in his returns for those years, by causing to make false and fictitious entries in the books of these corporations. These were the entries made by the rewritten sales sheets. Furthermore, the appellant's repeated contention that the withdrawals were income in spite of the charge in Point No. 3, and in the face of the appellant's own testimony that the withdrawals constituted an indebtedness, cannot be sustained and impels the definite conclusion that there was no error in failing to charge Point No. 4. It is to be remembered, however, that while the court granted the appellant's motion for arrest of judgment as to count one, it was after the verdict and has no bearing on the merits here discussed.

■ The next error alleged by the appellant is that the trial judge failed to instruct the jury as to the limitations on the taxability of corporate distributions. The trial judge, during the course of his charge, had adverted to the inclusion of dividends in gross income, but later withdrew what had been said concerning it and told the jury to totally disregard it and that, in determining the ultimate taxable income, there was no necessity for the jury to consider the definition of dividends or the exceptions thereto. Here again, counsel repetitively urged that the credits received by the appellant when his Loan and Exchange Accounts were credited came to him as a corporate distribution in the nature of a dividend and that something necessarily had to be said with respect to the limitations of these distributions imposed under the Internal Revenue Code, 26 U.S.C. § 316. It can only be repeated again that the Government's case, the indictment and the evidence introduced in proof of the charges had nothing to do with dividends, but that the income was only realizable to appellant when his indebtedness to the corporations, as shown in his Loans and Exchange Accounts, were repaid.

It is contended by the appellant that some authorities, in civil cases, denominate withdrawals as loans, and treat them in fact as dividends which constitute taxable income to the recipient at the time of the withdrawal, strongly relying on Spheeries v. Commissioner, 7 Cir., 284 F.2d 928 and Roschuni v. Commissioner, 5 Cir., 271 F.2d 267. The appellant can find no support in these cases, for his contention merely buttresses the position of the Government. In these there were findings of fact that the withdrawals were not borrowings, but dividends. However, in Spheeries v. Commissioner, supra, 284 F.2d at p. 931, the court specifically stated that it used as a guide, in its determination thereof, the subjective intention of the parties which was exactly the same instruction which the lower court gave to the jury and they determined, by their verdict, that they were borrowings.

This view is pointed up in Davis v. United States, 6 Cir., 226 F.2d 331, 335, where it is stated: "It is not necessary to go into the legality of the so-called distribution by appellant's wholly owned corporation to himself, or his extraction of the cash from the corporation, as it clearly appears that through the fraudulent transactions in which he was engaged, he received the cash over which he had complete control, which he took as his own, treated as his own, which resulted in economic value to him, and for which he probably never would have been required to account, had it not been for the discovery of the fraud on the revenue which he was perpetrating. Briggs v. United States, 4 Cir., 214 F.2d 699. * * * Appellant makes much of the fact that the government has not fixed a label of some kind on the funds that he took from his corporation. It is not necessary to describe them as additional salary, illicit bonuses, or commissions, or anything more than wrongful diversions, since, as above mentioned, substance controls over form, and taxation is concerned with the actual command over the property taxed." To the same effect is Cohen v. United States, 9 Cir., 297 F.2d 760, 768. Accordingly, we see no error in the court's failure to instruct the jury concerning limitations on the taxability of corporate distributions.

■ The next ground alleged as error is that the verdict on counts two and three and on counts four, five, seven, eight and nine are repugnant to one another and the evidence could not support the verdicts on the former and the latter. The contention of the appellant is that " * * * the money coming from the suppressed sales was either income to the corporation or to Goldberg, but could not be income to both." The argument runs that what appellant did constituted embezzlement and under the law as it existed at that time, embezzled funds were not income in that the appellant had no corporate authority for any of the

withdrawals. Here, the appellant, in support of his view, cites Commissioner v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L. Ed. 752. If we examine the facts in that case, it shows that Wilcox was merely a salaried bookkeeper employed by a Transfer and Warehouse company and that various sums of money which he had collected from customers, which were owing to his own company, he took and converted to his own use making no record of the sums he had so taken on the books of the company. Here, the court held under 26 U.S.C. § 22(a) that embezzled funds were not taxable.

In order to thoroughly appraise Wilcox, supra, we must consider Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833, wherein it was held that extorted funds were taxable income. Here, the facts showed that Rutkin had failed to report in his income tax return $250,000 which the jury found he had extorted by threats from one Reinfeld. The court, referring to Wilcox, supra, stated specifically that it had confined its decision solely to the facts of that case. Accordingly, as stated in Marienfeld v. United States, 214 F.2d 632, 637, the line of demarcation between the two cases must be determined by the facts in the individual case and it is submitted the facts in this case more clearly favor Rutkin v. United States, supra, in conformity with a similar comparison in this court by Kann v. Commissioner, 3 Cir., 210 F. 2d 247. Finally, in James v. United States, 366 U.S. 213, 217, 81 S.Ct. 1052, 1054, 6 L.Ed.2d 246, Wilcox, supra, was specifically overruled and in so doing the court stated: "Examination of the relevant cases in the courts of appeals lends credence to our conclusion that the Wilcox rationale was effectively vitiated by this Court's decision in Rutkin." Accordingly, since Rutkin was decided in 1952, we must now hold that even if appellant's conduct was embezzlement, the income was taxable, since Wilcox was decided in 1946.

 The rule is well established that unlawful, as well as lawful gains, comprise taxable income whenever the person receiving it, as a practical matter, has such control over it that he derives realizable economic value from it, Burnet v. Wells, 289 U.S. 670, 678, 53 S.Ct. 761, 77 L.Ed. 1439; Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916.

It is submitted the issue here concerns itself with whether money fraudulently taken by a person who owns and controls certain corporations and treats the same as an indebtedness intending to repay it, is an embezzler in the sense that he was so determined, under the facts in the Wilcox case. Appellant was not, in any sense, an employee, as Wilcox was, for in fact he was the real owner and an employer himself. Here, there was no such taking, as in the Wilcox case, where actual cash was taken by Wilcox and put in his own pocket without making any record thereof on the books of the company. Here was a scheme, fraudulent, deliberate and devious, persisted in for years, of taking from his corporations unreported income in excess of $300,000, as of December 31, 1954, as well as large sums during 1955 and 1956.

Here, we must remember money actually came into the business of these corporations in the form of cash; it was under their custody and control and recorded on their books and this money so recorded was fraudulently diverted or taken from the corporations at the direction of the appellant by rewriting the records and showing their corporate income reduced by large amounts and authorizing the original corporate records to be destroyed, facts which no case cited by the appellant is comparable to. Further, it is not this Court's province to differentiate legal issues between the appellant and his corporations, yet even so, it has been held that a defendant cannot be guilty of embezzlement of funds from his wholly owned corporations as here, United States v. Augustine, 3 Cir., 188 F.2d 359, Kann v. Commissioner, supra, for as said in Corliss v. Bowers, supra, " * * * taxation is not so much concerned with the refinements of title as it is with actual command over the

property taxed—the actual benefit for which the tax is paid."

The appellant relies heavily upon J. J. Dix, Inc., v. Commissioner, 2 Cir., 223 F.2d 436, as a comparable civil case. In that instance, the court upheld the taxation of the funds to the corporation but ruled, as to the stockholder, the monies received were the proceeds of his embezzlement and under the law existing was not taxable income. However, in the Dix case, supra, the Tax Court found that for the period in question $196,870.60 realized from corporate sales was secretly deposited in two banks and the amount so received was not recorded on their books nor included in their gross receipts on its tax returns. The corporation was controlled by one Jacob Dix, who through the domination of his son, fraudulently withheld the re-entry of these receipts from the corporation books and the Tax Court found that the gross income had been understated in the amount above described and fixed a tax deficiency of $62,054.23. As to Jacob Dix, the president of the corporation, he realized taxable income of some $56,000.00, which was the amount of the corporate funds he misappropriated, by simply drawing the money from the corporate bank account and diverting it to his own personal use which he, likewise, did not report as income. While the Tax Court held that diverted income from corporate sales was taxable, it relied on Wilcox v. Commissioner, supra, and held that mere withdrawal of the funds by the president of a one-man corporation was more similar to the Wilcox case than to Rutkin v. United States, supra, but, as we have pointed out above, little, if any, vitality remains in Wilcox. The holding of the Tax Court, with respect to the defendant, Dix, here again can be distinguished from our case, as the misappropriation by him of drawing funds from the bank is not, in any wise, like the devious, fraudulent scheme devised by the appellant. Additionally, while civil tax cases may be helpful under appropriate circumstances to draw analogies, they are to be distinguished from criminal cases especially with respect to the nature of the proof required. This is plainly stated in a civil tax case, Simon v. Commissioner, 8 Cir., 248 F.2d 869, 876; "In criminal income tax evasion cases, the exact amount of the tax evaded is not an important consideration. In criminal cases, it is necessary to prove only that the tax on some income has been fraudulently evaded. On the other hand, in civil proceedings for the collection of tax, an accurate determination of the accumulated corporate earnings is necessary to determine the amount of tax liability."

Accordingly, the individual liability of the appellant, as alleged in counts two and three, is, in no wise, repugnant to counts four, five, seven, eight and nine, which taxed the corporate income, for the reduction of his Loan and Exchange Account was an economic benefit to him, income, since his indebtedness to his corporations was reduced, and the rewriting of sales sheets diminished corporate income, each being separate and distinct schemes, and the ends of justice require them to be treated as such.

The next ground for error alleged by the appellant concerns itself with the admission of several letters handed to appellant, addressed to the respective corporations which he owned and controlled. There were two letters, one addressed to the Pennsylvania Coat and Apron Supply Co. and the other addressed to the Pennsylvania Laundry Co., both dated November 19, 1958, requesting permission to examine the books and records of the companies for the years 1954 and 1955. The trial court admitted the letters. Appellant's complaint is that they might possibly have been harmful to him since his cooperation in the investigation might have incriminated him under the Fifth Amendment. Here, again, the letters were addressed to the corporations and not to the appellant and, accordingly, as adverted to heretofore, he had no right to claim the Fifth Amendment with respect to the examination of the corporations' books and records. Furthermore, the trial court admitted the letters for the limited purpose of

showing a request by the Government, addressed to both corporations, for the purpose of examining their books. This was the first occasion the Government agents had ever met appellant and they apprised him, orally, of the Government's desire to investigate both corporations, which was the sole content of the letters. We see no error in their admission.

The next ground alleged as error is the denial of the appellant's motion by the trial court for a mistrial because one of the twelve jurors, Ida B. Robinson, had not been properly qualified to serve as a juror.

Among those summoned for possible jury duty was one Ida B. Robinson, who was No. 85 on the Petit Jury List, and one Lottie P. Robinson, No. 86 on that List. After reporting for duty, Lottie Robinson had been duly excused from possible service by the judge, then in charge of the criminal list, but by inadvertence her tag No. 86 remained in the box containing tags, bearing a number, each of which corresponded to a number before the name of a person on the Petit Jury List. When the first group from which twelve jurors would be chosen was in the process of being selected, the deputy clerk, on the twenty-third draw, drew tag No. 86 from the box, referred to the List and called No. 86 and the name of Mrs. Lottie Robinson. Mrs. Ida B. Robinson, No. 85 on the List, responded and seated herself in seat No. 20 of the first group. She occupied that seat because three of the previous twenty-two persons whose tabs were drawn had been excused for cause because their service on the jury at the time would have been a serious inconvenience to them. When twenty-eight out of thirty-five persons of the first group had been seated in succession, the presiding judge suggested that the persons whose tags were thereafter drawn be seated in a second group from which the four alternates would be selected. Defendant made no objection to this suggestion. Omitting one that was excused for serious in-

convenience, the tags of eight persons were then drawn from the box and the eight persons were directed to sit, in the order that they were called, in consecutively numbered seats.

After the voir dire examination of both groups had been completed, the remaining persons who had been summoned but whose tags had not been drawn were released for duty in another courtroom. Tag No. 85 was never drawn in this case. Thereafter, sixteen members of the first group were withdrawn as a result of their being challenged. This left exactly twelve persons seated in the first group occupying the following numbered seats: Nos. 2, 3, 4, 5, 8, 9, 11, 14, 15, 17, 20 and 23. At the request of the deputy clerk the person seated in No. 14 seat was asked to sit in No. 1, 15 in 6, 17 in 7, 20 (Mrs. Ida B. Robinson) in 10, and 23 in 12. In so doing, the deputy clerk directed Ida, calling her Mrs. Lottie Robinson, to take seat No. 10. Thereafter, the persons sitting in the 2nd, 4th, 5th and 7th seats of the second group were challenged and the remaining four persons were asked to take seats 13 to 16 in the order they were called. This group as a jury of twelve and four alternates were then sworn to try the appellant. Before the trial got underway, by agreement of counsel for both sides, with the approval of the trial judge, the person sitting in the No. 2 seat was replaced by the first alternate juror, No. 13, leaving three alternates.[1]

On the ninth day of the trial, a deputy clerk of court discovered No. 10 juror's true name and informed the trial judge of this fact. When he, in turn, notified counsel for both sides, appellant moved for a mistrial on the ground that juror No. 10 had not been properly qualified to take the oath and serve as a juror. The Government opposed the motion but left it to the trial judge whether to let Ida serve as a juror or replace her with an alternate. The trial judge denied the motion and directed that Ida be withdrawn and replaced by the then first al-

---

1. The reason for the replacement does not appear in the record.

ternate, No. 14. Appellant objected to the replacement. The trial then continued for another fourteen days. Immediately prior to the jury's withdrawal for deliberation after a twenty-three day trial, the two remaining alternates were excused from further duty in the case.

Under Article III, Section 2, and the Sixth Amendment of the Constitution, a defendant is entitled to be tried by a jury of twelve. Patton v. United States, 281 U.S. 276, 288–290, 50 S.Ct. 253, 74 L.Ed. 854; Capitol Traction Co. v. Hof, 174 U.S. 1, 13–16, 19 S.Ct. 580, 43 L.Ed. 873. Had Ida not responded to the calling of the name of Lottie, and since Lottie had been excused, juror No. 11 would have been juror No. 10 and No. 12 would have been No. 11. The first alternate, who became juror No. 2, would have been the 12th juror, and the second alternate, who became juror No. 10, would have been juror No. 2 instead. Thus the appellant was tried by the same combination of twelve people as he would have been had Ida not answered to the name of Lottie. All of them were present during the testimonial portion of the trial and also when the trial judge delivered his instructions. And, as the trial judge pointed out: "The jurors who passed upon his plea were all properly qualified to serve as jurors, had been carefully examined on voir dire and found acceptable." [2] The only difference being that the appellant was deprived of the services of an additional alternate for which he does not complain. Nevertheless, he argues that the jury was illegally sworn from the beginning because of the presence of Ida, and by reason thereof, there was in legal contemplation no jury in which a substitution could be made. The Government concedes that Ida, since she was never called to sit in the first or second group, was subject to being withdrawn from the jury box at the time of the trial judge's action. Did the Court's action require that appellant be awarded a new trial. We do not think so.

Until the passage of the Act of June 29, 1932, c. 309, 47 Stat. 380, 28 U.S.C. (1940 Ed.) § 417a,[3] there was no specific provision in the federal law for the selection of alternate jurors in criminal cases. Since September 1, 1948, authority for selecting them is derived from Rule 24 (c) of the Federal Rules of Criminal Procedure. This Rule provides as follows:

"(c) Alternate Jurors. The court may direct that not more than 4 jurors in addition to the regular jury be called and impanelled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath and shall have the same functions, powers, facilities and privileges as the regular jurors. An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict. * * * "

Appellant maintains that the reference in this subsection of the Rule to "the regular jury" indicates that the alternates are in addition to a jury of twelve which has been properly selected. The jury need not be twelve in number, but may be of a lesser number. Patton v. United States, supra, 281 U.S. at p. 299, 50 S.Ct. 253, 74 L.Ed. 854. This is apparently the reason why the subsection uses the expression "the regular jury" as a convenient reference to a group that is selected according to some prescribed rule or established usage.

Appellant also insists that, according to the subsection of the Rule, alternates may only replace jurors "who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties." This language,

2. 206 F.Supp. 394, at p. 399 [(E.D.Pa. 1962)].

3. Repealed by Act of June 25, 1948, c. 645, § 21, 62 Stat. 862, effective September 1, 1948.

appellant argues, clearly means that a regular juror may be replaced only when the reason for his disability or disqualification arises after his selection and before his retirement to deliberate. Had the framers of the subsection, the argument runs, been of the view that a juror could be replaced where the reason for his disqualification existed at the time of his selection, and went undiscovered, until after the jury was sworn and the trial commenced, they would not have used the words, "became unable or disqualified". Appellant appears to lose sight of the fact that the challenge of a juror for cause may be waived by the accused and the prosecutor. Here the appellant, after he learned of the real identity of Ida, could have consented to her serving on the jury.[4] Instead he objected to her doing so by asking for a mistrial. It was at this juncture that Ida became "unable or disqualified" to serve on the jury. This could not have been known until appellant raised his objection. That Ida was subject to being withdrawn upon being challenged from the time she responded to the name of Lottie cannot obliterate that fact. At least two Courts of Appeals have decided that Criminal Rule 24(c) does not prevent the replacement of a juror by an alternate after the jury has been sworn. In one, the existence of the disqualifying factor was discovered before testimony was taken. Gillars v. United States, 87 U.S.App.D.C. 16, 182 F.2d 962. In the other, midway during the trial. United States v. Zambito, 315 F.2d 266, 269, cert. den. 373 U.S. 924, 83 S.Ct. 1524, 10 L.Ed. 2d 423. Also see United States v. Gottfried, 2 Cir., 165 F.2d 360, 365, cert. den. 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139. Except for some provisions not material here, Rule 47(b) of the Federal Rules of Civil Procedure is identical to Criminal Rule 24(c). The latter Rule embodies the practice prescribed for civil cases by Civil Rule 47(b). See Note of the Advisory Committee on Rules to subdivision (c) to Criminal Rule 24. In Larson v. General Motors Corporation, 2 Cir., 148 F.2d 319, 322, cert. den. 326 U.S. 745, 66 S.Ct. 34, 90 L.Ed. 445, a case in which the construction of Civil Rule 47(b) was involved, the Court of Appeals for the Second Circuit could see no reason why the words "jurors who * * * become unable or disqualified to perform their duty" should not be construed so as to cover "an ineligibility on the part of a juror that is first discovered after the trial has begun." Accordingly, there was no error in the trial court's denial of the motion for mistrial.

■ Another alleged error was the admission of certain summaries into evidence, prepared by Government agents and taken largely from the records produced by Rudy, Ferrari and Dombkiewicz. Since we here hold these records admissible, there can be no objection to the summaries prepared from them and, therefore, there was no error in their admission.

■ An additional alleged error, although not presented at argument, asserts that the court had no jurisdiction to try the appellant on counts eight and nine, as his returns were filed in Camden, New Jersey. However, these two counts of the indictment are different from counts four, five, six and seven, in that they charge appellant with "causing to be prepared" and "causing to be filed with the Director of Internal Revenue at Camden, New Jersey." However, the record discloses ample testimony on which the jury could and did find that the appellant caused them to be prepared at Philadelphia in the Eastern District of Pennsylvania.

Accordingly, the judgment of conviction and sentence will be affirmed.

4. When he learned of the mix-up, counsel for the appellant stated: "I do not and cannot state now that had we been confronted with [Mrs.] Lottie Robinson we would have challenged her * * *." (N.T. p. 984.)