**In the Matter of David W. MARGULIES, Bankrupt.**

**No. B-693-63/6735.**

United States District Court
D. New Jersey.

April 6, 1967.

1952, Damar Products, Inc. (hereinafter Damar) was organized—with the Bankrupt as its president and sole stockholder. The business conducted by Damar was that of a wholesale supplier of household items. The Bankrupt, in addition to his activities with Damar, also operated a mail-order business as a sole proprietorship. In connection with the mail-order business the Bankrupt purchased on credit large quantities of household items from Damar.

Some time prior to 1957 the Bankrupt discontinued the mail-order operation and transferred it, including mailing lists, to Damar. The indebtedness of the Bankrupt to Damar arising out of the credit purchases remained on Damar's books. Subsequent to the transfer Damar carried on both its wholesale supply business and the mail-order business.

On May 1, 1957, two agreements were entered into. By the terms of a "sale and leaseback" arrangement Damar "sold" its mailing lists to a group represented by a William Manowitz (hereinafter Group) for $45,000. The Group then "leased back" the lists to Damar for a period of 32 months (to December 31, 1959) at a "rental" of $1,350 per month. By the terms of a second agreement the Bankrupt agreed to purchase the lists from the Group for $15,000 at any time during the year following the expiration of the lease that the Group desired to consummate the sale.

On February 24, 1959, just under twenty-two months after the "sale and leaseback" arrangement and prior to the maturity of his repurchase obligation, the Bankrupt purchased the lists from the Group for $15,000. Seven months later, on September 25, 1959, the Bankrupt transferred the lists to Damar. At that time the lists had a fair market value of $15,000 but the "sale" to Damar was stated at the inflated price of $150,000. At this time, Damar's books still showed an indebtedness owing to it from the Bankrupt of $134,972 arising out of the credit purchases he had made prior to 1957 while in the mail-order business. The September 25, 1959 "purchase" was

Max L. Rosenstein, Newark, N. J., Seymour J. Kehlmann, New York City, of counsel, for petitioner.

David M. Satz, Jr., U. S. Atty., by Kenneth P. Zauber, Asst. U. S. Atty., Newark, N. J., Julius M. Jacobs, Internal Revenue Service, of counsel, for respondent United States.

## OPINION

LANE, District Judge:

The facts in this case have been stipulated by the parties. On January 11,

reflected on Damar's books by crediting the indebtedness due from the Bankrupt with $150,000, thereby eliminating the debit balance and leaving a net credit balance of $15,028 due the Bankrupt.

In his 1959 income tax return the Bankrupt reported the transaction as a sale resulting in a long-term capital gain of $135,000—claiming a $15,000 basis for the mailing lists. The Bankrupt had never engaged in the trade or business of buying or selling mailing lists.

On April 22, 1963, a jeopardy assessment was made against the Bankrupt by the Commissioner of Internal Revenue in the amount of $67,217.81, including interest. On June 21, 1963, a notice of deficiency was mailed to the Bankrupt. On June 29, 1963, the Bankrupt filed a petition in bankruptcy. Subsequently, but within the statutory period, he filed a petition in the Tax Court for redetermination of the deficiency but the petition was denied for lack of jurisdiction.

The District Director of Internal Revenue on behalf of the United States of America filed a claim in the bankruptcy proceedings. That claim, as amended, included amounts owing by virtue of the Government's disallowance of the Bankrupt's treatment of the transfer of the lists to Damar for $150,000 and for 1960 estimated tax. The Trustee objected to these claims and the Referee by an Opinion dated November 29, 1966, and an Order entered on December 30, 1966, dismissed the objections. The Trustee has appealed from the Referee's Opinion and Order.

The parties have stipulated that the amount of the estimated tax liability for 1960 should be reduced to $790.18, and the Government has abandoned its contention that the Bankrupt had a zero basis for the mailing lists. Thus the only question before us is whether the $135,000 realized by the Bankrupt upon the transfer of the mailing lists to Damar should be taxed as capital gain or as ordinary income.

The Bankrupt contends that the $135,000 gain should be taxed as a long-term capital gain, asserting two theories in support of this contention. The first is the one set out in his 1959 income tax return, i. e., the gain is the result of the sale of a capital asset held for more than six months. As an alternative, he argues that the transaction should be treated as a section 301(a) corporate distribution, and, since Damar had no earnings and profits and the Bankrupt had a zero basis for his stock, the corporate distribution would be taxed as a capital gain under section 301(c).

The Government, on the other hand, contends that the $135,000 should be taxed as ordinary income. In support of this it argues that the Bankrupt should not be allowed to redesignate the transaction as a corporate distribution under section 301(a) and hence should not be taxed under section 301(c). The Government then argues that because of the gross disparity between the fair market value of the mailing lists and the price for which they were sold, the transaction amounted to a fraud on the revenue, and capital gain treatment should be disallowed.

■ We will first deal with the Bankrupt's claim that the cancellation of his indebtedness should be treated as a corporate distribution. Section 301(a) provides:

> In general.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317 (a)) made by a corporation *to a shareholder with respect to its stock* shall be treated in the manner provided in subsection (c). (Emphasis added.)

In order for this section to come into operation it is necessary that the value received by the shareholder be in his capacity as a shareholder. See Treas. Reg. § 1.301–1(c).

■■ The Bankrupt in his 1959 tax return elected to treat the cancellation of his indebtedness as part of the receipts from the sale of the mailing lists. He now asserts that it was actually a corporate distribution to him in his capacity as a shareholder. The cases cited by the

Bankrupt in support of his attempt to redesignate the transaction are cases in which it was the *Government* who was attempting to have a transaction treated as a corporate distribution. See e. g., Goldstein v. Commissioner, 298 F.2d 562 (9th Cir. 1962); Robert Binda, T.C. Memo 1963–236. We read these cases as holding that *the Government may* look through certain corporate transactions and characterize them as corporate distributions. (In fact, this would probably be the Government's contention in the instant case if Damar had earnings and profits.) However, the fact that the Government has this power to redesignate these corporate transactions does not mean that this power is also available to the taxpayer. Consequently, we do not feel that the Bankrupt should now be allowed to claim that his transaction was something other than what he called it. Cf. Higgins v. Smith, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406 (1940).

This, however, is not dispositive of the case. The Bankrupt called the transaction a sale and, in fact, reported it as such on his 1959 tax return. He treated the gain as long-term capital gain, claiming that the item sold was a capital asset held for more than six months.

■ There is no explicit section of the Internal Revenue Code which would disallow capital gain treatment for such a sale. This is not a case covered by section 1239 of the Code since the mailing lists appear not to be depreciable property. See Thrifticheck Serv. Corp. v. Commissioner, 287 F.2d 1 (2d Cir. 1961); Meredith Pub. Co. v. Commissioner, 64 F.2d 890 (8th Cir.), cert. denied, 290 U.S. 646, 54 S.Ct. 64, 78 L.Ed. 560 (1933). See generally 4 Mertens, Federal Income Taxation, § 23.82 (1966).

Instead the Government relies on a line of cases which has its roots in Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833 (1952) and Davis v. United States, 226 F.2d 331 (6th Cir. 1955), and finds some support in this Circuit in United States v. Goldberg, 330 F.2d 30 (3d Cir. 1964). These cases involved taxpayers being prosecuted criminally for willfully attempting to evade taxation.

In *Rutkin* the taxpayer had failed to report sums of money which he had extorted and in *Davis* the taxpayer failed to report sums of money which he had diverted from his corporation. As a defense to the criminal charges the taxpayers claimed that the money in question was not taxable income and, therefore, there was no wrongdoing in failing to report it. In both cases the defense was rejected,—the courts finding that the values received were taxable income. The question of whether this taxable income should be taxed as ordinary income or as capital gain does not appear to have been litigated.

This question, however, was raised to some extent in the *Goldberg* case. The taxpayer in that case was indebted to his corporation in the sum of about $280,000 by virtue of loans which it had made to him. The taxpayer, by means of falsifying his corporation's sales receipts and understating them, reduced his indebtedness to the corporation by applying the difference between the true cash receipts and the understated value against his indebtedness. He did not report the reduction of indebtedness as income and was convicted of willfully attempting to evade taxation. On appeal he claimed *inter alia* that it was error for the trial judge to refuse to charge the jury on the limitations on taxation of corporate distributions. In effect, he was claiming that the reduction of indebtedness was a corporate distribution and was taxable under section 301(c). The court held that there was no error since the Government's case rested on the fact that the reduction in his indebtedness constituted taxable income under the general definition of income. Thus, the court held that the taxpayer had no right to have the jury pass on the question of whether the cancellation of indebtedness was a corporate distribution. The taxpayer not asserting any other theory to support capital gains treatment, the amount which was found

to constitute taxable income was taxed as ordinary income.

There is no question but that the $135,000 involved in the case at bar is taxable income. The only question is how it should be taxed. The Bankrupt relying on the plain language of the Internal Revenue Code claims that he is entitled to long-term capital gains treatment since his gain arose out of the sale of a capital asset held for more than six months. The Government, however, seeks to disallow such treatment by relying on the *Rutkin-Davis-Goldberg* line of cases.

It is our feeling that the Government's reliance on these cases is misplaced. These cases merely stand for the proposition that in certain cases where a person acquires real economic value by dubious means, he will be deemed to have received taxable income. The cases do not hold that the value received must be treated as ordinary income. While it is true that the taxable income in the above cited cases was taxed as ordinary income, the reason for this is that those taxpayers were unable to bring themselves within the provisions of the Code which would result in their obtaining capital gains treatment.

In the instant case, however, the Bankrupt cast his transaction in such a form that he appears to be entitled to capital gains treatment. (It should be noted that this would also be true if Damar had declared a corporate distribution to the Bankrupt on September 25, 1959, in the amount of $135,000 and paid it out by cancelling his indebtedness.)

The mere fact that the sale in question may not have been a bona fide arm's length transaction is not in our view a sufficient basis to disallow capital gains treatment to the Bankrupt. In order to convince us to disallow such capital gains treatment, it must be demonstrated that as a result of the Bankrupt's questionable transaction the Government collected less than it was entitled to; it must be shown that under existing law the $135,000 should have been taxed as ordinary income. On the record before us we are not convinced that this is so.

While we are in no wise implying approval of the sale of the mailing lists at the inflated value, we do not deem it our function to penalize taxpayers who engage in such transactions. Acceptance of the Government's contention would be tantamount to saying that capital gains treatment will be disallowed whenever it arises out of a transaction conducted at less than arm's length. We feel that the tax laws are complicated enough without adding unwarranted judicial gloss. If a given type of transaction is felt to present fertile ground for abuse, Congress should foreclose the abuse by enacting legislation as was done by the enactment of section 1239. See also, e. g., Int.Rev.Code of 1954, §§ 1245, 1250.

Accordingly, we hold that the objections raised by the taxpayer to the Commissioner's determination will be sustained. A form of Order is to be submitted.