UNITED STATES of America

v.

AMERICAN RADIATOR & STANDARD
SANITARY CORPORATION et al.

UNITED STATES of America

v.

PLUMBING FIXTURE MANUFACTUR-
ERS ASSOCIATION et al.

Crim. Nos. 66–295, 66–296.

United States District Court
W. D. Pennsylvania.

Oct. 23, 1967.

See also 274 F.Supp. 790.

Malcolm Anderson, Pittsburgh, Pa., Fred A. Freund, New York City, for John B. Balmer.

Frank L. Seamans, Pittsburgh, Pa., for Joseph J. Decker, Daniel J. Quinn, and Lawndale Industries, Inc.

Alexander Unkovic, Pittsburgh, Pa., for Norman R. Held.

John D. Ray, Ray & Good, Beaver, Pa., for Robert E. Casner.

James A. Bell, Thorp, Reed & Armstrong, Pittsburgh, Pa., for Universal-Rundle Corp.

J. Robert Maxwell, Pittsburgh, Pa., for Stanley Backner.

Thomas M. Kerr, Jr., Pittsburgh, Pa., for Robert J. Pierson, Jr.

J. Craig Kuhn, Pittsburgh, Pa., for George W. Kelch.

Elliott W. Finkel, Pittsburgh, Pa., for Gerber Plumbing Fixtures Corp.

David J. Armstrong, Pittsburgh, Pa., for Rheem Mfg. Co.

Clayton A. Sweeney, Pittsburgh, Pa., for Borg-Warner Corp.

Maurice Wechsler, Pittsburgh, Pa., O'Brien, Driscoll & Raftery, New York City, for Briggs Manufacturing Co.

J. Vincent Burke, Pittsburgh, Pa., for Ogden Corp.

Eugene B. Strassburger, Pittsburgh, Pa., for Mansfield Sanitary, Inc.

William J. Kenney, Pittsburgh, Pa., for Kilgore Ceramics Corp.

Harry W. Miller, Pittsburgh, Pa., for Georgia Sanitary Pottery, Inc.

Robert Wayman, Pittsburgh, Pa., for Peerless Pottery, Inc.

Harold E. Kohn, Aaron Fine, and David Berger, Philadelphia, Pa., for intervenors.

John Fricano, Dept. of Justice, Antitrust Div., Washington, D. C., and Gustave Diamond, U. S. Atty., Pittsburgh, Pa., for the United States.

Hubert I. Teitlebaum, Pittsburgh, Pa., for American Radiator & Standard Sanitary Corp.

Malcolm Anderson, Pittsburgh, Pa., for Wallace-Murray Corp.

T. W. Pomeroy, Jr., W. Walter Braham, Jr., Pittsburgh, Pa., for Plumbing Fixture Mfrs. Assn.

Paul J. Winschel, J. T. Fort, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Kohler Co.

Harold R. Schmidt, Pittsburgh, Pa., for Crane Co.

## OPINION

ROSENBERG, District Judge.

This matter relates to two joint motions filed by the defendants in the above

entitled cases for the dismissal of indictments and for suppression of certain evidence.

On October 6, 1966, after a lengthy inquiry into the activities of the plumbing manufacturers throughout the United States, a grand jury in the United States District Court for the Western District of Pennsylvania presented two separate indictments charging the defendants variously named in the two criminal actions with antitrust violations. The first indictment at Criminal No. 66–295 charges eight corporate defendants, a trade association and eight individual defendants with engaging in a conspiracy, in violation of § 1 of the Act of Congress of July 2, 1890,* commonly known as the Sherman Act. This indictment charges, in substance, that the defendants conspired to fix the prices of enameled cast iron and vitreous china plumbing fixtures beginning sometime in September 1962 and continuing at least until sometime in 1966.

The second indictment at Criminal No. 66–296 charges ten corporate defendants and the trade association with engaging in a conspiracy in violation of § 1 of the Sherman Act, to fix the prices of staple vitreous and china plumbing fixtures beginning in November 1960 and continuing to June 1962.

In the joint motions to dismiss and suppress, the defendants charge a wrongful making of the evidence and its illegal procurement and use in bringing about the grand jury indictments and prosecution of the charges as contained in the indictments. The defendants had additionally requested that the motions to dismiss and suppress be heard en camera. Affidavits were required to be submitted by both sides for the purpose of providing information upon which a determination could be had as to whether or not there should be en camera proceedings, and whether a hearing was required on any issue of fact on the joint motions to dismiss and suppress.

These affidavits were filed en camera until a proper determination could be had on whether or not en camera proceedings should be effected. The Government filed four affidavits. One of these was by its representing attorney, John C. Fricano, who set forth the chronology generally of the receipt and use of information by the Department of Justice in these prosecutions.

The affidavit of Special Agent William Kendig of the Internal Revenue Service deposes generally to the agents' activities in dealing with the contacts made with the Plumbing Fixture Manufacturers Association (Association) and its general counsel, James McKay. The affidavit indicates that three tape recordings were procured when the Executive Vice-President of the Association, Stanley Backner, pointed to a desk belonging to an absconding executive secretary, William Kramer; that he assisted the agents in going through the desk; and that he allowed them to take the three tapes, a part of the desk's contents, because no recorder was available for replay in the Association's office. The agent indicates that the Association's counsel McKay directed the agents to Mrs. Carol Jean Gray, a sister of the absconding secretary, from whom the special agents procured three additional recorded tapes. He also reveals the contacts made between the Internal Revenue Service and the Federal Bureau of Investigation or the Antitrust Division of the Department of Justice, as the case may be.

The third affidavit is from William Kramer, the former executive secretary of the Association. His affidavit describes how all the tapes were made and states that he authorized his wife to turn over to the Department of Justice tapes which he had placed in her possession.

The fourth affidavit is from Kramer's sister, Mrs. Carol Jean Gray. She deposes that she had been in contact with or been contacted by the Internal Revenue Service agents and had cooperated

---

* 15 U.S.C. § 1.

with them and turned over to them a suitcase containing her brother's personal belongings and had given the agents certain information relating to her brother.

The defendants' attorneys filed a joint affidavit consisting of twenty-five pages in which they asserted that they were the attorneys for the defendants; that they had received information which they believed to be true regarding the tapes; that the tapes were made in violation of law; that they were illegally seized by the Government; and that the use to which they were put in connection with the grand jury proceedings was unlawful. This joint affidavit did not materially contradict the factual averments contained in the Government's affidavits, but rather emphasized denials of any illegality as applying to the defendants. The affidavits did set forth the circumstances as they related to a meeting of the executive committee and to a meeting of the general membership in August and November 1963, respectively. This I accept as factual. However, this affidavit had set forth no factual contradictions of the plaintiff's affidavits. The defendants were then directed to submit an affidavit or affidavits of a factual nature as would disclose an issue of material fact requiring a hearing.

The defendants thereafter filed five affidavits. One was from Mary Louise Rubio who had secretarial charge of the Association's office. She asserts that she did not hear Special Agent Kendig ask for a tape recorder, but she does not say that he did not ask for it. She says that the new executive vice-president, Stanley Backner, did not aid the special agents in searching Kramer's desk, but she does say that he sat in a chair beside the desk as the agents went through it and examined its contents.

The second affidavit is from Muriel Bell, an attorney who asserts that she received no cooperation from Kramer, Mrs. Kramer, Mrs. Gray, or Kendig, as she attempted to interview them. Three affidavits are presented by officers of certain of the defendant corporations as to what transpired at the executive committee meeting or the regular membership meeting in August and November, 1963, respectively. The affidavits are deposed by Raymond A. Pape, Manager of Plumbing Product Sales of the defendant, Crane Company; J. Vincent Cannon, Jr., Vice-President-Marketing of the defendant Wallace-Murray Corporation; and D. H. Walkup, President of the defendant Kilgore Ceramics Corporation. These three affidavits divulged what had occurred at the meetings in August and November, 1963, respectively, when the Association's counsel McKay reported to the respective meetings that Kramer had embezzled Association funds and absconded and certain other details. The affidavits indicate what action had been taken at both meetings. They conclude that the authorization for cooperation was only as it related to the Internal Revenue Service and Kramer, and not as it might have affected any acts by the defendants.

■ Thus no substantial issue of fact was presented by all the defendants' affidavits which required an evidentiary hearing. No reason appeared why these joint motions should not be heard in open court and the defendants' request for an *en camera* hearing was denied on August 8, 1967. An opinion setting forth the reasons for the decision was filed.

### FINDINGS OF FACT

As based upon evidentiary affidavits, I make the following findings of fact.

William E. Kramer had been employed by the defendant Plumbing Fixture Manufacturers Association as its executive secretary from February 1954 until August 5, 1963, when he absconded to the Bahamas. The defendant Plumbing Fixture Manufacturers Association is an unincorporated Association in the nature of a trade association. The membership controls the direction of its business under its constitution, by a vote of a majority of members present at any membership meeting. The executive committee carries on the Association's affairs between such meetings. Article 7, Clause 1 of the Association's constitution pro-

vides that the executive committee has "full authority to conduct the affairs of the Association between meetings, except as the Association may restrict its authority from time to time." Its membership includes all of the corporate defendants in these cases.

At a meeting of the executive committee held at the Mayflower Hotel in Washington, D. C. on August 29, 1963, counsel for the Association, James McKay, informed the committee members that several days prior it had been discovered that Kramer, the Association's executive secretary, had apparently absconded with considerable sums of the Association's money; that Kramer had apparently been embezzling monies of the Association for the past several years; that McKay had made intensive efforts to locate Kramer; and that on August 27, 1963, he had succeeded in reaching him by telephone in the Bahamas. McKay reported that in this telephone conversation Kramer admitted that he had appropriated funds of the Association, and also stated that if the Association took any action to order an audit or report him to the bonding company, he would turn over to the Federal authorities certain information which he had in his possession which, Kramer said, indicated that "various members of the Association had been engaging in price-fixing activities."

The executive committee considered the McKay report and decided that the Association should advise its auditing firm to undertake an immediate audit to ascertain the amounts of the embezzlement and report the matter to the bonding company. The Association held a general meeting of the membership on November 5, 1963, at the Mayflower Hotel in Washington, D. C. At this meeting Attorney McKay advised the general meeting of the Kramer circumstances. He informed the members of the meeting of the threats by Kramer, which threats he had report-

ed to the executive committee at its August 29th meeting. At this meeting a representative of the Association's firm of auditors reported that an audit indicated that a large sum of Association funds was unaccounted for. The audit apparently showed the extent of Kramer's embezzlement.

The Association's counsel also advised of a visit to the Association's offices in October 1963 by Internal Revenue Service agents who had asked to look at the Association's financial records bearing on a possible violation of income tax laws by Kramer as flowing from his embezzlement activities of the last few years. A consensus of the general meeting was that Kramer's reported threats were just a desperate effort on his part to prevent any attempt by the Association to recover the funds. It then decided that the executive committee of the Association should proceed to employ counsel to take action as in the judgment of the executive committee was necessary to protect the interests of the Association and for the recouping of as much of the embezzled funds as possible, and also to deliver information to the Internal Revenue Service or any other Government agency investigating Kramer's income tax violations (or embezzlement) as the executive committee should deem appropriate to protect the interests of the Association. This was incorporated in a resolution and became a part of the minutes for that meeting.[1]

At the same meeting on November 5th, Stanley Backner was elected to replace Kramer with a change of title from executive secretary to executive vice-president. The scope of duties remained essentially the same as before.

Mr. McKay then reiterated to the Internal Revenue Service Agents the willingness of the Plumbing Fixture Manufacturers Association to cooperate in any way possible. The agents again visited

1. The Resolution reads as follows: "Resolved that the Executive Committee is empowered to employ counsel to take such immediate action as in the judgment of the Committee, is necessary to protect the interests of the Association including, but not limited to, the filing of such suits, the bringing of such complaints and delivery of information to such public authorities as the Committee in its discretion deems appropriate."

the Association's office on November 6, 1963, the day after the membership meeting. They represented to Mr. Backner that they were continuing their investigation of possible tax violations by Kramer. They had come there for the purpose of picking up certain copies of the Association's cancelled checks which were to have been ready for them. These were furnished by Mrs. Mary Louise Rubio, the office secretary. The agents also interviewed Mr. Backner on that visit. Backner at that time informed the agents that Kramer's desk was still in the office and he showed it to the agents. Backner opened the desk and in his presence the agents searched it. It contained files relating to Kramer's personal business transactions, personal belongings and three reels of tape recordings. One of these tape recordings was labeled "Kansas City" in handwriting, the second tape bore no handwriting and the third tape had attached on it a label "R–1" in handwriting. There was no tape recorder in the office so Backner allowed the agents to take the reels of tape recordings with them in order to determine if they were relevant to the tax investigation. The agents promised that the tape recordings would be returned. Subsequently, when the tape recordings were played at the Internal Revenue Service office, it was found unexpectedly that one of them contained telephone conversations which indicated a possible violation of Federal antitrust laws. Sometime in February 1964 Attorney McKay telephoned and asked to have the tape recordings returned to the Association. He was then advised that the tapes would have to be retained because they indicated the possible violation of other Federal laws. McKay, by pre-arranged appointment on April 1, 1964, came to the agents' office and listened to a tape recording which it was thought indicated a possible violation of the Federal antitrust laws. The Association had variously made available to the agents a number of its files and records, including the cancelled checks, expense records and auditor's reports. They were allowed to conduct interviews of the Association's employees and independent accountants employed by the Association. Affidavits were secured from Attorney McKay and Mary Louise Rubio. The Association's office manager and Mr. McKay also volunteered leads to other information concerning Kramer and his assets.

The Internal Revenue Service agents were instructed by the Department of Justice to turn over to the Federal Bureau of Investigation information relating to possible violations of the antitrust laws. This was on February 13, 1964. Accordingly, copies of the recordings considered pertinent were provided to the Federal Bureau of Investigation. This was the only communication between these agents and any representative of the Department of Justice concerning possible antitrust violations by the Association or its members.

The special agents had received, in late October 1963, a telephone call from Attorney McKay informing them that Kramer's house had been sold by a realtor whom McKay identified, and that Kramer's sister, Mrs. Carol Jean Gray, acted for Kramer in the sale by his power of attorney. While in the Bahamas, Kramer had given Mrs. Gray an unlimited power of attorney. In the telephone conversation with the agents, McKay advised that Kramer's Thunderbird automobile had been moved from the Yacht Club, and he furnished Mrs. Gray's address. By pre-arranged appointment, Special Agents Kendig and Burkhardt went for the first time on December 9, 1963 to interview Mrs. Gray at her home. She stated that she would cooperate in the investigation of Kramer. As pre-arranged, the agents returned on January 8, 1964, and Mrs. Gray informed them that there was a suitcase of Kramer's in the attic crawl space of her home. With Mrs. Gray's permission, they removed the suitcase and examined its contents. Three reels of tape recordings were among other things found in the suitcase. With Mrs. Gray's permission they took the suitcase and its contents and gave Mrs. Gray a signed receipt. Sometime later that year, the agents returned all

of the material she had given them, except the three tape recordings. The agents told her they could not return these because it appeared that they might relate to other Federal violations, and it was their obligation to report all possible violations of Federal laws.

Executive Vice-President Backner called the agents on January 7, 1964, and stated that the Association had received a threatening letter from Kramer, and also advised that the letter had been turned over to the Federal Bureau of Investigation.

The former executive secretary Kramer had in 1965 sent certain tape recordings to his wife, Thecla Kramer, and instructed her to submit these to the Antitrust Division of the Department of Justice. Sixteen tapes were submitted by Mrs. Kramer to the Antitrust Division on August 19, 1965, and three tapes were submitted at a later date. Thus, the Department of Justice received twenty-five reels of tape recordings. Six of these the Antitrust Division obtained from the Internal Revenue Service and nineteen from Mrs. Kramer. A number of these tapes were recordings of telephone conversations between Kramer and other persons. The balance of tapes were recordings of a meeting of the Association in Chicago and not over telephonic equipment.

All of the tapes, as they were found by the Internal Revenue Service agents and as they were submitted by Mrs. Kramer to the Antitrust Division, were created and completed without the knowledge, consent or approval of any Government agency or agents, or by the Association, its officers or members, but were altogether contrived and brought about by Kramer.

There is nothing in the records of the Department of Justice nor does its counsel have any information indicating that any Federal Government official authorized, encouraged, participated in, or had knowledge of the making of any of the twenty-five reels of tape recordings, or of Kramer's taking any of such recordings from the Association's offices.

Specifically, the Department of Justice records reveal that the first information it received indicating a possible violation of Federal antitrust laws by the Association or its members was contained in a letter dated December 17, 1963, sent by Kramer to Attorney McKay, which letter McKay furnished the Federal Bureau of Investigation on December 24, 1963. The Federal Bureau of Investigation transmitted this letter on February 10, 1964 to the Antitrust Division. The Antitrust Division received a letter on or about February 13, 1964, from the Internal Revenue Service stating that information had been received during the course of a tax investigation of Kramer, which information indicated the possibility of a price-fixing conspiracy among members of the Association. The Antitrust Division obtained Internal Revenue Service copies of the two reels of tape recordings from the Internal Revenue Service through the medium of the Federal Bureau of Investigation at the direction of the Antitrust Division. In April 1965, authority was granted to conduct a grand jury investigation. The Antitrust Division issued a Civil Investigative Demand to the Association on May 27, 1964, calling for the production of various documents. Kramer was indicted in the United States District Court of Maryland for the illegal transportation of stolen property in interstate commerce; as well he was charged by information for the willful failure to file income tax returns. In June 1965, Kramer was also indicted in the United States District Court of Maryland for bail jumping. Kramer's attorney in November 1964 and in January 1965 attempted to obtain a commitment from the Department of Justice not to oppose pleas of nolo contendere if Kramer would cooperate fully with the Antitrust Division, but the Department of Justice would not make any commitments.

The nineteen reels of tape recordings were submitted by Mrs. Kramer voluntarily without any assurance, expressed or implied, that Kramer would secure any favor or leniency. Kramer surrendered

and was placed in custody in Baltimore pending trial. The Antitrust Division counsel sought permission from Kramer's attorney to interview him in jail, but was refused such an interview unless the Antitrust Division promised that Kramer would be called before the grand jury and given immunity. That commitment was refused and no interview was conducted. Subsequently in December 1965, Kramer pleaded guilty to bail jumping and nolo contendere to the charges of failure to file income tax returns and the illegal transportation of stolen property in interstate commerce. The District Court accepted these pleas.

Pursuant to the preparation of a presentence report, the probation officer conferred with the Antitrust Division. He was then shown certain material which Mrs. Kramer had turned over to the Division. The probation officer was informed that Mrs. Kramer had turned over the evidence without any promise of favorable treatment and no one else in the Antitrust Division made any recommendation to the probation officer or anyone else concerning Kramer's sentence. It was only after Kramer had been sentenced that he was interrogated by the Antitrust Division attorney. He was not advised that he would be called as a grand jury witness until virtually all his interrogation had been completed. Subsequently in March 1966, the Parole executive of the Board of Parole called the Department of Justice regarding Kramer's relationship with it as it might be material to a hearing on parole. The Parole executive was advised that Kramer had cooperated with the Antitrust Division while incarcerated. But the Parole executive was advised that neither Kramer nor his wife had asked for any favorable consideration during the grand jury investigation and that the Antitrust Division had never promised any.

The grand jury was empaneled in June 1965. Thirty-five witnesses testified during approximately 155 hours, and the indictments were returned on October 6, 1966.

The defendants seek to dismiss the indictments as they are based upon the twenty-five tape recordings and all other evidence flowing or sequential to them, and move such evidence be suppressed. In substance, the defendants contend

(1) The tape recordings were *made* in violation of law because those tapes made over or by use of the telephone violated § 605 of the Federal Communications Act and FCC regulations. Additionally, the tapes, both over the telephone and at the meetings, were made without the consent of the parties conversing and without knowledge that their conversations were being recorded in violation of their constitutional rights.

(2) The tape recordings were unlawfully *obtained* by the Government because they were the property of the Association or its members, and their taking from the Association's office and from Kramer's sister or the accepting from Kramer's wife by the Government's representative amounted to an unlawful search and seizure for which neither the Association nor any of its members waived their rights.

(3) The tape recordings were unlawfully *used* by the Government because, having been made in violation of law and having been illegally seized without any waiver of the affected parties, the divulgence of the contents of any of these tapes tainted the grand jury proceedings. As such, evidence obtained in violation of the Fourth and Fifth Amendments to the Constitution, as were these tapes, are inadmissible in Federal criminal trials.

They contend also "that any and all other evidence obtained from leads provided by the tapes—the 'fruit of the poisonous tree'—is also inadmissible and thus must be suppressed." (Page 73 of the defendants' brief) In any event the defendants argue that if it be held that the tape recordings were not made, obtained or used in violation of Federal statutory and constitutional law, this Court "should nevertheless suppress the recordings and their fruits in the proper exercise of supervisory power over the administration of criminal justice."

(Page 74 of the defendants' brief) Because the attack here by the defendants is made basically on the method of making and the procurement by the Government of the tapes, and because the contents of the tapes are for the purpose of the motion not here material, and there was no request by any of the parties for the divulging of the contents of these, the determination here made is not based upon what they do or may contain.

The defendants have filed a number of exhaustive briefs and cited a large number of cases in support of their theories for dismissal of the indictments and suppression of the tape recordings. Practically all of these cases present only inferential arguments. The Government, too, has filed exhaustive briefs and presented a considerable number of cases. It will be unnecessary to discuss or differentiate all these cases, for the most part, since the issues here are neither complicated nor unprecedented. Our Federal courts have already passed upon these matters and I am required only to apply the pertinent principles of law. I shall discuss the defendants' third contention first.

■ Were the indictments by the grand jury tainted by any evidence which might have been illegally created, obtained or used before the grand jury? We have one recent case by which our Court of Appeals gives us guidance and which controls here. United States ex rel. Almeida v. Rundle, C.A. 3, September 20, 1967, 383 F.2d 421. Judge Kalodner stated at page 424:

> "On this score, it is settled law that (1) (an) indictment returned by a legally constituted nonbiased grand jury * * is enough to call for a trial of the charge on the merits and satisfies the requirements of the Fifth Amendment', Lawn v. United States, 355 U.S. 339, 349, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); (2) an indictment cannot be challenged 'on the ground that there was inadequate or incompetent evidence before the grand jury', Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956);

and (3) a prosecution is not abated, nor barred, even where 'tainted evidence' has been submitted to a grand jury, United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966).

"We gave effect to the foregoing cases in United States v. Grosso, 358 F.2d 154 (3 Cir., 1966). There; the trial court had denied the defendant's motion for the dismissal of his indictment which was premised on the ground that the indictment was predicated at least in part on illegally seized evidence. In rejecting the defendant's contention that the denial of his motion to dismiss the indictment was ground for reversal, we said (p. 163): 'It is well established that an indictment is not open to challenge on the ground that the evidence presented to the grand jury was either inadequate or incompetent'. To the same effect see United States v. Labate, 270 F.2d 122 (3 Cir. 1959), cert. den. sub nom. Sussman et al. v. United States, 361 U.S. 900, 80 S.Ct. 211, 4 L.Ed.2d 157; see too, West v. United States, 359 F.2d 50, 55–56 (8 Cir. 1966)."

Accordingly, I cannot find here that the grand jury proceedings in arriving at these indictments were tainted, so as to require dismissal of the indictments.

■ The defendants' second contention is that the tapes were unconstitutionally acquired by the Government. Our controlling authority is Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). In *Burdeau* the defendant's business associates had taken from his safe, without his knowledge, certain documents and had turned them over to Government officials. The defendant McDowell then filed a petition seeking their return, as they were about to be presented to the grand jury. It was held in *Burdeau* that since the documents came into the possession of the Government without a violation of McDowell's rights by any Government authority, the Government could retain them and use them as evidence. The Supreme Court

stated (at page 476, 41 S.Ct. at page 576):

"The papers having come into the possession of the government without a violation of petitioner's rights by governmental authority, we see no reason why the fact that individuals, unconnected with the government, may have wrongfully taken them, should prevent them from being held for use in prosecuting an offense where the documents are of an incriminatory character."

Our Court of Appeals for the Third Circuit followed this ruling in United States v. Goldberg, 330 F.2d 30, C.A. 3, 1964, cert. den. 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964). The facts in the *Goldberg* case, supra, were very similar to those of *Burdeau,* except that the records that were taken by the business associates were not personal records of the defendant, but belonged to the various corporations concerned. The defendant contended, as the defendants do here, that Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) [2] placed in question the continuing validity of the rule in Burdeau v. McDowell, supra. The Court of Appeals for the Third Circuit did not agree. Judge Ganey stated that, in *Elkins,* "the court was only concerned with state action and its ruling, no wise, impaired Burdeau v. McDowell * * *"

The defendants argue that *Burdeau* should now no longer be the controlling law because, as in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L. Ed. 819 (1943), the court may and should suppress "the recordings and their fruits in the proper exercise of supervisory power over the administration of criminal justice." (Defendants' brief page 74) In *McNabb* it was held that where defendants had been unlawfully detained in violation of the federal statute requiring prompt arraignment before a commissioner, a confession made during the detention would be excluded as evidence in federal courts even though not inad-

missible on the ground of any otherwise involuntary character. This case was cited as authority pursuant to Nardone v. United States, 308 U.S. 338, 341–342, 60 S.Ct. 266, 84 L.Ed. 307 (1939), to show that there is imposed a supervisory power in Federal courts which must be exercised over the administration of criminal justice. Mr. Justice Frankfurter, at page 340, 63 S.Ct. at page 613, said:

"Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence. Such standards are not satisfied merely by observance of those minimal historic safeguards for securing trial by reason which are summarized as 'due process of law' and below which we reach what is really trial by force."

In the present case, the defendants contend that, even if it is determined that no statutory or constitutional violation is found for suppression, it is nevertheless inherently "unfair" to permit the use of the tapes as evidentiary material. However, defendants can cite no case in which a court has employed its supervisory power to exclude evidence obtained by a private individual, no matter how morally reprehensible is the conduct of that individual.

*McNabb* can have no application for in that case, as stated above, the exclusion of evidence resulted because of improper conduct of a law enforcement officer. That law enforcement must to some extent rely on evidence provided by morally reprehensible individuals is well known and as stated in Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 418, 17 L.Ed. 2d 374, 387,

"In the words of Judge Learned Hand, 'Courts have countenanced the use of informers from time immemorial; in cases of conspiracy, or in other cases when the crime consists of preparing for another crime, it is usually necessary to rely upon them or upon accom-

---

2. In *Elkins,* it is stated that evidence received by the Federal Government from State officials, which had been illegally obtained by the latter, was inadmissible in the Federal Court—the so-called "silver platter doctrine".

plices because the criminals will almost certainly proceed covertly. \* \*'
United States v. Dennis, 2 Cir., 183 F.2d 201, at 224."

Speaking of the actions by the Internal Revenue Service agents in *McNabb*, after one of their members had been shot and after their process of tracking down the guilty person by long and unusual seclusions and questioning of the suspected person, Mr. Justice Frankfurter said 318 U.S. 332, at page 342, 63 S.Ct. 608 at page 613:

"They subjected the accused to the pressures of a procedure which is wholly incompatible with the vital but very restricted duties of the investigating and arresting officers of the Government and which tends to undermine the integrity of the criminal proceeding."

None of this existed in *Burdeau* or *Goldberg*. None of this exists in the present case. None of the defendants, nor their representatives were here pressured, and no illegal processes were here used to procure any evidence. The evidence as it came to the Government came either by means of the controllable functions of the defendants themselves, or from a formerly trusted representative and business associate of their own appointment. Thus, while *McNabb* speaks of judicial supervision of administration of criminal justice in the Federal courts, it does not control the facts of this case as does *Burdeau,* and *Goldberg*.

We are urged to set aside the *Burdeau* holding on the theory that it is an old case and eventually will be overturned by the Supreme Court in the light of its other decisions on constitutional questions. I cannot accept these arguments for the reason that all inferior federal courts as well as all state courts, inferior or appellate, are bound by the determinations of the Supreme Court as the final law of the land. Furthermore, I am bound by the *Goldberg* case, supra, decided in 1964 and am cognizant of the fact that the Supreme Court denied certiorari (377 U.S. 953, 84 S.Ct. 1630 (1964).

I have carefully examined the evidence presented and find no unconstitutional seizure. The defendants argue that all of the tapes were illegally seized. I do not so find. The three tapes in the Association's office were taken with the permission of its executive vice-president Backner. It is argued by the defendants that they did not give permission, but this argument is difficult to accept in the face of the undenied fact that Backner sat by Kramer's desk and permitted its search by the Internal Revenue Service men, and raised no protest whatsoever. Therefore, the evidence in the affidavits that permission was granted is in my opinion acceptable and undisputed.

The fact that Mrs. Rubio said that she did not hear Backner's consent to the taking of the tapes by the agents is negative in character and does not contradict the specific and direct assertions of the affidavits. Furthermore, the executive vice-president's action was consistent with the resolutions of both the executive committee in August and particularly the general membership in November to cooperate with the "governmental authorities empowered to apprehend or prosecute Mr. Kramer in connection with his embezzlement or resultant tax delinquencies, together with the delivery of information relevant to such proceedings against Mr. Kramer." The fact that the affected parties, who are now defendants, in making this authorization to the Internal Revenue Service and "any other government agency" had no farsighted concept of their own possible involvement, does not change the fact that the warrant was granted. This is further strengthened by the fact that both the executive committee in August and the general membership in November were warned by the Association's counsel that Kramer had evidence of price-fixing and possible antitrust violations. Thus, they were put on notice that any evidence which they furnished to the Government and which Kramer had participated in might effectually divulge actual price-fixing and antitrust violations as voiced by Kramer and so guide the Government

into Kramer's threatened plan. Because of the cooperation of the general meeting of the Association and its executive committee the first three tapes as they were turned over to the Internal Revenue Service constituted no seizure requiring a formal warrant. Therefore, the cases cited in respect to the requirements for search and seizure ·are not appropriate here.

As for the other twenty-two tapes, did the surrender by Kramer and his wife and sister of these violate any of the defendant's constitutional rights?

First, we are factually informed that the Association's counsel, McKay, directed the Government's agents to Kramer's sister, Mrs. Gray. We may well conclude that this was done for the purpose of involving Kramer by a seizure of any of Kramer's self-incriminating possessions. We have no indication that the Association or its counsel considered that the tapes may have contained evidence to incriminate any of the Association's members or officers. However, there was no objection by anyone at the time of the "seizure" of such evidence by the agents. On the contrary, there was a showing of consent. Mrs. Gray cooperated and turned over the tapes and Mrs. Kramer personally delivered nineteen of the tapes, as she was authorized to do by Kramer. There is a lack of information in this connection, but in any event, it is obvious that the Association and the general membership, as evidenced by the August and November meetings, wanted the Government to get everything that it could which might produce evidence against Kramer. The Government acquired twenty-five tapes from Kramer in three different ways, and only the first three of these were procured from the premises of the Association with the consent of its executive vice-president and with the authorizations by the two meetings.

In connection with these various tapes, the defendants argue that these belong to the Association and presumably were paid for from Association funds. Even if they were the property of the Association, the Association did consent to cooperate with the Internal Revenue Service and "any government agency" and agreed to turn over not only checks, papers and other records relating to Kramer, in cooperating with the Government and its agents, and in this connection it turned over the first three tapes. As to those tapes which came to the Government from Mrs. Gray and Mrs. Kramer and not directly from the Association, even if we assume that the tapes were the property of the Association and that Kramer misappropriated them, the *Burdeau* case controls and the evidence can be used in a criminal proceeding.

In *Burdeau* the thief took the papers directly to the Government. Following *Burdeau*, in Geniviva v. Bingler, 206 F.Supp. 81 (W.D.Pa., 1961), Judge Sorg refused to suppress evidence which had been burglarized from the plaintiff's house and which evidence the Internal Revenue Service obtained from the thief.

The case before us falls somewhere between *Burdeau* and *Geniviva* on its facts, for while Kramer, the alleged thief, himself did not turn over the tapes to the Government, nevertheless he authorized someone else to do so and the Government did not resort to legal process to obtain them from the bailees, possessors or custodians of the tapes.

The defendants' third contention is that the tapes were made in violation of Federal statutes, FCC regulations and State laws without the knowledge or consent of the defendants, for all of which reasons they were not legally constituted evidence in these proceedings.

Almost identical contentions were discussed and disposed of by the United States Court of Appeals for the Second Circuit in United States of America v. McGuire, Blumner and Perry, 381 F.2d 306, C.A. 2, 1967, in an opinion filed on July 20, 1967, upholding the admissibility of certain recordings of telephone conversations: (Page 314)

"Appellants also claim that the disc recordings were inadmissible because their receipt in evidence violated Section 605 of the Federal Communications Act, 47 U.S.C. § 605. They first

urge that interception of a telephone conversation by one of the parties to the conversation is a violation of the Act even though this position has been rejected by the Supreme Court in Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957) * *

Alternatively, appellants urge that use of these recordings violates Section 605 because that statute provides that not only the interception but the divulgence of an intercepted conversation requires the consent of one of the parties to the conversation. The relevant part of Section 605 reads:

> * * * no person not being authorized by the sender shall intercept any communication and divulge or publish the * * * contents * * of such intercepted communication to any person; * * * and no person having received such intercepted communication * * * shall divulge or publish the * * * contents * * * of any part thereof * * *

Though it appears from this language that it is well arguable that the statute prohibits unauthorized divulgence of 'intercepted communication[s]' see United States v. Zarkin, 250 F.Supp. 728, 735 (D.D.C.1966), it would not literally seem to prohibit unauthorized divulgence of a communication which was intercepted by or with the consent of one of the parties to the communication; this therefore would not be an 'intercepted communication' within the meaning of the statute. Moreover, as we have concluded that the court below found that the records were voluntarily turned over to the Government by McGuire, there was also no prohibited divulgence. Section 605 surely does not mean that a party to a telephone conversation may not disclose it, or a recording of it, to another or that the other may not use it if he does."

As to the recordings of the meeting or meetings in Chicago and the contention that such recordings violate the Illinois eavesdropping statute, it is well established that evidence obtained in violation of state laws is nevertheless admissible in Federal courts. On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L. Ed. 1270 (1952); Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928); United States v. Alexander, 218 F.Supp. 916 (W.D.Pa., 1963).

As relates to those tapes, which recorded the Chicago meeting and not telephonically communicated, the evidence as gleaned from the affidavits indicates only that a certain section of the Association membership was present at the meeting. Whether or not Kramer was present is not indicated. Presumably as the executive secretary, he was present, but even assuming that he was not present, the defendants cite no authority other than state laws which prohibit the making of surreptitious tapes by any individual. Accordingly, it would appear that these tapes of the Chicago meeting present no elements of illegality which would interfere with their acceptance by the Government, when they were offered, or by the Government's use of them thereafter.

The defendants also argue that in any event the tapes which were procured from the Association directly or through the Association counsel's aid were permissible for use by the Government only as they related to any involvement by Kramer; and that the Association did not authorize the "seizure" of these tapes by any other agency of the Government to be used against the Association or its members. As this question is already raised, it is answered in this opinion and a restatement in detail is not necessary, that when the executive committee and the general membership meetings authorized cooperation with the Government or "any other government agency", after they had been forewarned by McKay of Kramer's threatened intimidations based upon price-fixing and antitrust violations, there is no basis for this last argument.

Finally, counsel for the defendants, at the argument on these motions, accused the Government and its agents

of associating and dealing with an "embezzler", "thief", and "blackmailer", and of aiding and abetting such a person as it pursued this antitrust action against the defendants. A part of counsel's charges was put in these words: (Tr. pgs. 43–44)

"But when you put the picture together of what law-enforcement did here, you have to weigh equities, and here is a situation where almost everything was done. Almost every kind of illegal, immoral and improper thing was done here, not all by the Government, but partly by the Government and partly by Mr. Kramer."

He then added: (Tr. pg. 50)

" * * * that the use of them by the Government constitutes a violation of the Fourth Amendment, a violation of the Fifth Amendment, and in any event, it is within your power under McNabb to sanitize the proceedings which badly need sanitizing."

From the evidence which was before me, I did not and could not make a finding as was asserted by the defendants' counsel at the argument. For the present I see nothing censurable on the part of the Government or its agents in procuring these tapes in the manner in which they were procured, and of getting whatever information they could from Kramer. I find that no promises were made to Kramer; nor were any inducements given to procure any information outside the legal formula provided for their activities or in any unprofessional manner by the Government's counsel. I do not here concern myself with the merits of the case as they existed between Kramer and his former employers, except to say that if the former employers misplaced their trust in their executive secretary, and he violated that trust, both by stealing their money and by divulging secrets between them, the error of the employee's ways, at this juncture, cannot prevent the Government from using the evidence supplied by Kramer. As stated in Hoffa v. United States, supra, 385 U.S. at page 302, 87 S.Ct. at page 413, "Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."

I should also add that Justice Jackson in On Lee v. United States, supra, 343 U. S. at page 756, 72 S.Ct. at page 973, said "Society can ill afford to throw away the evidence produced by the falling out, jealousies, and quarrels of those who live by outwitting the law."

The defendants' contention that these tapes are inadmissible at a trial of these cases because they are made and procured in violation of the defendants' rights under the Fourth and Fifth Amendments to the Constitution presently fall for the reason hereinbefore discussed. But that does not say that all the evidence which may be offered at the trial of the case will not be submitted to scrutiny and objection on any legally proper basis.

Accordingly, the defendants' joint motions to suppress the evidence and to dismiss the indictment will be denied.