**UNITED STATES of America**

v.

**AMERICAN RADIATOR & STANDARD SANITARY CORPORATION et al.**

**Crim. A. No. 66-295.**

United States District Court
W. D. Pennsylvania.

Aug. 19, 1968.

Hubert I. Teitlebaum, Pittsburgh, Pa., for defendant American Radiator & Standard Sanitary Corp.

Malcolm Anderson, Pittsburgh, Pa., for defendants Wallace-Murray Corp. and John B. Balmer.

T. W. Pomeroy, Jr., W. Walter Braham, Jr., Pittsburgh, Pa., for defendant Plumbing Fixture Manufacturers Association.

Paul J. Winschel, J. T. Fort, Pittsburgh, Pa., for defendant Kohler Co.

Harold R. Schmidt, Pittsburgh, Pa., for defendant Crane Co.

Frank L. Seamans, Pittsburgh, Pa., for defendants Joseph J. Decker and Daniel J. Quinn.

Alexander Unkovic, Pittsburgh, Pa., for defendant Norman R. Held.

John D. Ray, Beaver, Pa., for defendant Robert E. Casner.

James A. Bell, Pittsburgh, Pa., for defendant Universale-Rundle Corp.

J. Robert Maxwell, Pittsburgh, Pa., for defendant Stanley Backner.

Thomas M. Kerr, Jr., Pittsburgh, Pa., for defendant Robert J. Pierson, Jr.

J. Craig Kuhn, Pittsburgh, Pa., for defendant George W. Kelch.

David J. Armstrong, Pittsburgh, Pa., for defendant Rheem Manufacturing Co.

Clayton A. Sweeney, Pittsburgh, Pa., for defendant Borg-Warner Corp.

Maurice Wechsler, Pittsburgh, Pa., for defendant Briggs Manufacturing Co.

John C. Fricano, U. S. Dept. of Justice, Antitrust Div., Washington, D. C., Thomas A. Daly, Asst. U. S. Atty., Pittsburgh, Pa., for the United States.

## OPINION

ROSENBERG, District Judge.

Counsel for the seventeen defendants in the above entitled case have filed a joint motion to suppress twenty-five reels of tape recordings of telephone conversations and meetings and evidence derived therefrom. A previous joint motion to suppress, presented by the defendants on February 16, 1967, was denied by order of this Court on October 23, 1967, for the reasons that the tape recordings had not been illegally made and were not illegally procured and used by the Government. 278 F.Supp. 241, 1967.

The present motion to suppress is based upon what counsel for the defendants say is "consistent with 18 U.S.C. §§ 2510–2520, recently enacted in the Omnibus Crime Control and Safe Streets Act of 1968, Pub.Law 90–351, effective June 19, 1968." The defendants move to suppress the contents of the tape recordings on the ground that disclosure of that information or its use in evidence would violate specifically § 2515 of the Omnibus Crime Control Act.

On October 6, 1966, after a lengthy inquiry into the activities of the plumbing manufacturers throughout the United States, a grand jury in the United States District Court for the Western District of Pennsylvania presented two separate indictments charging the defendants variously named in the two criminal actions with antitrust violations. The first indictment at Criminal No. 66–295 charges eight corporate defendants, a trade association and eight individual defendants, with engaging in a conspiracy, in violation of § 1 of the Act of Congress of July 2, 1890 (15 U.S.C. § 1), commonly known as the Sherman Act. This indictment charges, in substance, that the defendants conspired to fix the prices of enameled cast iron and vitreous china plumbing fixtures beginning sometime in September 1962 and continuing at least until sometime in 1966.

The second indictment at Criminal No. 66–296 charged ten corporate defendants and the trade association with engaging in a conspiracy in violation of § 1 of the Sherman Act, to fix the prices of staple vitreous and china plumbing fixtures beginning in November 1960 and continuing to June 1962.

The case at Criminal No. 66–296 has been terminated by entry of pleas of nolo contendere.[1] The case at Criminal

---

1. The Government did not contest those pleas.

No. 66–295 remains to be tried, as scheduled, on November 18, 1968.

The joint motion of the defendants here is based upon the contention that the Omnibus Crime Control Act is procedurally retroactive in effect and controls admissibility of all evidence of wire and oral interception in criminal proceedings, no matter when the interception may have occurred. This they support on the theory that the Act itself specifically states the intention to make it retroactive and so prohibit the introduction of all wire and oral interception not made as prescribed by the Act; and, even if the Act does not plainly so state, statutory construction requires that the Act be applied retroactively.

Attached to the present motion is an affidavit of Clayton Sweeney, Esquire, counsel for one of the defendants, in which he deposes to hearsay facts. However, the findings of fact have already been made heretofore on affidavits presented by the parties in previous motions. 278 F.Supp. 241, 1967.

Briefly, I here present the facts pertinent to this motion as follows: that William E. Kramer was Executive Secretary of the defendant Plumbing Fixture Manufacturers Association from February 1954 until August 5, 1963; that in the period from 1961 to 1963, allegedly in pursuance of a scheme for embezzlement, Kramer surreptitiously had a mechanical electronic device placed on the office telephone to intercept and record telephone conversations which he had with various persons, including some of the individual defendants and counsel for the Association; that on January 9, 1962, Kramer had private detectives, using hidden electronic recording devices attempt unsuccessfully to tape record a meeting of the Association which took place in the Morrison Hotel, Chicago, Illinois; that on February 21, 1962, the same detectives successfully recorded the conversations which took place at a meeting of the Association at the Knickerbocker Hotel, Chicago, Illinois; that Kramer thereafter absconded and it was allegedly learned that he had embezzled over $200,000; that counsel for the Association communicated with Kramer in the Bahama Islands at various times; that Kramer informed him that he had secretively made tape recordings of various persons connected with the Association, which contained evidence of antitrust violations by them; that if the Association prosecuted him on the embezzlement charges, he would turn over the tapes to the Government; that this information was reported to the Executive Committee and later to the members of the Association; that they considered this a "desperate effort on his part to prevent any attempt by the Association to recover the funds" and as such a "mere threat"; that the Association Executive Committee and the membership ordered the matter to be turned over to the United States Internal Revenue Service for investigation of possible violations by Kramer; that the IRS men consequently came to the Association office and, with the consent of the Executive Officer of the Association, received a certain number of tapes which they found in Kramer's desk; that subsequently on learning of possible antitrust violations as the tapes divulged such information, the IRS agents turned the tapes over to the Antitrust Division of the Department of Justice; that later a certain number of tapes were received from Kramer's sister, and still later the Department of Justice received a certain number of tapes from Mrs. Kramer, which had been in her possession and which had been directed to be turned over by Kramer; and, that from these tapes and other matters the Government commenced an inquiry and presented the tapes and other evidence to the Grand Jury at Pittsburgh which presented the indictments which followed.

We need not here discuss the various questions which have heretofore been raised and determined, except to state that many motions, many arguments and many conferences have occurred since the start of this action, which, as stated, was linked to the one at Criminal No. 66–296 already disposed of by nolo con-

tendere pleas. At the last one of these conferences, held informally but on the record before me, on June 26, 1968, counsel for the Government agreed to turn over a copy of the tapes which the Government contemplated using in evidence at the trial of the case, and the defendants agreed to receive them through one of their number of the defendants' counsel. Thus, a set of copies of the tapes were turned over to Attorney Sweeney acting on behalf of all counsel for the defendants in this action. However, upon learning that the Omnibus Crime Control and Safe Streets Act of 1968 had become effective on June 19, 1968, Mr. Sweeney refused to permit the defendants to use or hear any of the tapes in his possession and this motion to suppress was filed.

At the argument counsel for the defendants agreed that the issue presented on the facts of this case was whether or not the Omnibus Crime Control Act precludes the use of the tapes as evidence in the forthcoming criminal proceeding trial.

Judge John Lord, Jr. of the Eastern District of Pennsylvania was recently called upon to make a determination on the production of these tapes in the hands of Mr. Sweeney for discovery purposes in civil actions for treble damages [2] brought by a large number of plaintiffs against the same corporate defendants in this case. In an opinion dated July 29, 1968, Judge Lord determined that the Act did not apply to the tape recordings as the action was commenced for the production of the tape recordings on the plaintiffs' motion for production under Federal Rule of Civil Procedure 34.

Counsel for the defendants here argue that Judge Lord's determination did not decide the question of admissibility of the tapes in evidence as prohibited by § 2515 of the Omnibus Crime Control Act but only as they were usable or productive under Rule 34 motions. It is not necessary for me to deal with the effect of Judge Lord's ruling in this criminal proceeding because after hearing arguments of counsel and researching their briefs, a careful examination of the Act convinces me that the Congress did not intend to and did not prohibit the use of tapes in the instant action.

The defendants argue that Congress indicated, by the language contained in the Act, that the Act was intended not only to protect the right to privacy of the public and to ban interceptions such as were engaged in by Kramer, but the Act was also intended to maintain the integrity of the court and court proceedings, and to do so retroactively. The distinction was made by the defendants between the punitive sections of the statute which delineated the crime and provided the penalties therefor and, what they called, the "remedial" part of the legislation which was an evidentiary rule addressing itself to procedural matters and the integrity of court proceedings.

The defendants relied in great measure on the language contained in § 2515 of the Act which provides:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

The defendants point out that in this evidentiary section, unlike the earlier sections dealing with the substance of interception, Congress does not differentiate between the interceptions made in

---

2. The Philadelphia Housing Authority, on Behalf of Itself and All Others Similarly Situated, Civil Action No. 41733; Lindy Bros. Builders, Inc. of Philadelphia, et al. v. American Radiator & Standard Sanitary Corporation, et al., Civil Action No. 41774.

violation of the Act and those made prior to the passage of the Act, because Congress in § 2515 refers only to "any wire or oral communication" which has been intercepted. The defendants also point to §§ 2516, 2517 and 2518 of the Act which deal with the procedures and standards to be applied by the courts in those instances where wiretapping is permitted and where the evidence disclosed by wiretapping is properly admissible in evidence. The defendants argue that § 2516 provides not only that a wiretap may be authorized in advance, but wiretapping which has "already provided evidence" may be approved. These words, they contend, can have no other meaning than to indicate the intended retroactive effect which was provided by Congress. Section 2516 can only have reference to the period after June 19, 1968.

But, in any event, the defendants conclude that if the specific phrases of the language of the statute do not indicate clearly that § 2515 is to be applied retroactively, then it involves some ambiguity and calls into action the rule of general statutory construction that when a statute is primarily procedural, on the question of retroactivity, it is to be construed as having retroactive application.

A careful examination of the Omnibus Crime Control and Safe Streets Act of 1968 discloses that in this legislation Congress did not exclusively deal with the question of wiretapping and electronic surveillance as the subject matter is specifically termed in Title III of the Act. The Act, as a whole, encompasses the broad subject matter of crime prevention and controls. The purpose of the legislation is plainly stated in the preamble of Title I:

> "Congress finds that the high incidence of crime in the United States threatens the peace, security and general welfare of the Nation and its citizens. To prevent crime and to insure the greater safety of the people, law enforcement efforts must be better coordinated, intensified, and made more effective at all levels of government."

The provisions of the entire Act reflect an effort on the part of Congress to legislate for all levels of government so far as it was in Congress' power to do so.

It is common knowledge that Congress and the President have been met with increasing crime and law enforcement failure. Complaints were and are made that both law enforcement agencies and the courts are ineffectual in controlling or preventing crime. These complaints also have been directed at state legislatures and particularly at Congress to provide better enforcement laws. In order to fight and prevent crime on every level, to obstruct organized crime, to reverse trends of violence and disrespect for law throughout the United States, and to energize law enforcement and to strengthen court power, Congress has enacted the Omnibus Crime Control Act. The Act deals with this subject matter subdivided into 10 titles. Congress makes plain by explanation and findings that this Act is intended to aid not only the federal law enforcement agencies, but also those classified as state and local law enforcement agencies.

Title I—Law Enforcement Assistance —provides for grants for improving state and local law enforcement agencies and sets forth administrative provisions.

Title II—Admissibility of Confessions, Reviewability of Admission in Evidence of Confessions in State Cases, Admissibility in Evidence of Eyewitness Testimony, and Procedures in Obtaining Writs of Habeas Corpus—is enabling for law enforcement in federal and state cases. The title also deals with procedures in obtaining writs of habeas corpus as well as eyewitness testimony.

Title III—Wiretapping and Electronic Surveillance—provides certain prohibitions and regulations as they relate to wire or oral communications and devices used for these purposes, as well as a formula for their legal use by law enforcement officers or private persons with the further proviso for immunity of citizens under certain

circumstances and for the admissibility or inadmissibility of evidence relating to wire or oral communications as provided in the formula contained in Title III.

Title IV—State Firearms Control Assistance—provides for additional controls for the traffic in firearms under certain circumstances.

Title V—Disqualification for Engaging in Riots—is aimed at the control and prevention of riots and civil disorders.

Title VI—Confirmation of the Director of the Federal Bureau of Investigation—provides for more responsible appointment of the Director of that Department.

Title VII—Unlawful Possession or Receipt of Firearms—provides for additional controls and penalties.

Title VIII—Appeal by the United States from Decisions Sustaining Motions to Suppress Evidence—provides for the right of the United States Attorney to take interlocutory appeals on the granting of a motion to suppress evidence.

Title IX—Additional Grounds for Issuing Warrant—provides for the issuance of a search and seizure warrant for evidence of a criminal offense in violation of the laws of the United States.

Title X—Prohibiting Extortion and Threats in the District of Columbia— provides for ransom or reward threats for the release of kidnapped persons in the District of Columbia.

Title XI—General Provisions—relates to preserving the valid provisions of the Act if other provisions are declared to be invalid.

From an examination of the provisions under these various titles we see an overall Act which seeks to procure certain results by improving conditions existing heretofore. All of the titles are aimed to accomplish improved conditions. The very title of the Act as it is to be cited is indicative of its meaning, the Omnibus Crime Control and Safe Streets Act.

■ Out of the context of the whole Act, the defendants have pointed to § 2515 as contained in Title III and as now providing a separate evidentiary remedy applicable retroactively to them on criminal charges allegedly committed sometime during 1962 through 1966. If we were to take this one section out of context with the Act as a whole, even then we could not agree with the defendants, because in spite of their arguments § 2515 specifically and unequivocably in a one sentence provision includes the words "if the disclosure of that information would be in violation of this chapter." We may not separate this phrase from the entire sentence nor can we divorce the section from the Act as a whole and place it in a position where provision is made for admission or exclusion of evidence generally at a trial. We view the Act as a whole and from its context as a whole derive the meaning of all its phases and phrases. United States v. Zacks, 375 U.S. 59, 84 S.Ct. 178, 11 L.Ed.2d 128, 1963; Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492, 1962; Jarecki v. G. D. Searle & Co., 367 U.S. 303, 81 S.Ct. 1579, 6 L.Ed.2d 859, 1961; C. I. R. v. Bilder, 289 F.2d 291, C.A.3, 1961. Congress helps us to understand its meaning when it relates the entire section to the phrase "violation of this chapter."

■ We see in this Act under Title III an attempt of Congress to provide for the orderly use of electronic devices both for the purpose of respecting individual rights and also for the purpose of aiding in crime detection. It has elaborately set out under this title a formula which applies not only to law enforcement officers but as well to individuals. It sanctions uses under the control of the courts, both federal and state governments, for lending aid to greater enforcement of prosecution and crimes. And it provides penalties for failure of the use of the formula in violation of its definitions and precise specifications.

In accordance with the strictness and specificity of its formula, it provides for the future conduct of those who would use wiretapping and electronic surveillance, and it plainly indicates in § 2515 that if one does not use it in accordance with the formula contained in this chapter, such matter is inadmissible in evidence at the trial of a case. But it is absurd to say that the formula could be made retrospective, and that no evidence obtained in the past, before the enactment, could be admissible in evidence. Certainly no one could have contemplated the formula in 1962 through 1966. The law frowns on an absurd interpretation of a statute. Pritchard v. Liggett & Myers Tobacco Co., 350 F.2d 479, C. A.3, 1965; American Dredging Co. v. Local 25, Marine Division et al., 338 F.2d 837, C.A.3, 1964.

■■ As an aid to the enforcement of the formula set out in the provisions of this statute, Congress included a provision to prohibit the use of the fruits of any evidence obtained in violation of the provisions of the statute. This was in effect the remedial method provided for securing compliance with the formula in all its aspects; for, without prohibiting the admission of evidence obtained in violation of the formula, the effectiveness of the formula would be lost.

The defendants would have us look at isolated portions of the Act and find that Congress divorced § 2515 from the rest of the Act. Considering the Act, as a whole, and keeping in mind the purposes for which it was enacted, it is clear that Congress did not so intend.

Section 2515 of the Act prohibits the use as evidence of intercepted wire or oral communications "if the disclosure of that information would be in violation of this chapter." Thus, one learns what is prohibited as evidence only by learning what constitutes "disclosure" illegal under the Act. Section 2511(1)

(c) states that a person violates the Act if he "willfully discloses * * * the contents of any wire or oral communication, *knowing or having reason to know that the information was obtained* through the interception of a wire or oral communication *in violation of this subsection* * * *"* (Emphasis supplied)

The interception in the instant case and the obtaining of the fruits of the interception by the Government in the instant case were not illegal. 278 F.Supp. 241, 1967. And the tape recordings were not procured in violation of the provisions contained in the formula of the Omnibus Crime Control Act, since there was not at that time any such enactment. Therefore, since there was no illegal interception here, any disclosure or evidentiary use of these tapes by the Government could not involve the requisite willfulness or knowledge of illegality specified in the Act and thus would in no way be prohibited by the Act.

This is not to say that Congress could not have drafted legislation so as to make the provision on inadmissibility of evidence retroactive, if it proposed to do so, by simple words, but Congress did not do so.

The defendants cite several authorities where the statutes involved clearly evidenced Congressional intention to give retroactive application. The defendants also cite as authority decisions which hold that procedural statutes changing a rule of evidence are not ex post facto, and which support the power of a legislature to set up standards or procedural rules of evidence and determine the date upon which they shall become effective in trial procedures. These principles have no application in the instant case.

I agree with District Judge Lord that the Crime Control Act speaks only prospectively. For this reason, the motion to suppress will be denied.